*Board of County Commissioners of Washington County, Maryland v. Perennial Solar, LLC*, No. 66, September Term, 2018, Opinion by Booth, J.

**MUNICIPAL CORPORATIONS – IMPLIED PREEMPTION – CONCURRENT AND CONFLICTING EXERCISE OF POWER BY STATE AND LOCAL GOVERNMENT**

State law impliedly preempts local zoning regulation of solar energy generating systems ("SEGS") that require a certificate of public convenience and necessity ("CPCN"). Maryland Code, Public Utilities Article § 7-207 grants the Maryland Public Service Commission broad authority to determine whether and where a SEGS may be operated.

IN THE COURT OF APPEALS

OF MARYLAND

No. 66

September Term, 2018

BOARD OF COUNTY COMMISSIONERS
OF WASHINGTON COUNTY, MARYLAND

v.

PERENNIAL SOLAR, LLC

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Getty
Booth,

JJ.

Opinion by Booth, J.

Filed: July 15, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the MD. Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

"Here comes the sun, and I say, It's all right."

-The Beatles, "Here Comes the Sun"

This case involves the intersection of the State's efforts to promote solar electric generation as part of its renewable energy policies, and local governments' interest in ensuring compliance with local planning and zoning prerogatives. In this matter, we are asked to determine whether state law preempts local zoning authority with respect to solar energy generating systems that require a Certificate of Public Convenience and Necessity ("CPCN") issued by the Maryland Public Service Commission.

This case began with an application by Perennial Solar, LLC ("Perennial") to the Washington County Board of Zoning Appeals ("Board") for a special exception and variance to construct a Solar Energy Generating System ("SEGS") adjacent to the rural village of Cearfoss in Washington County, Maryland. After the Board granted the variance and special exception, a group of aggrieved landowners sought judicial review of the Board's decision in the Circuit Court for Washington County. The Board of County Commissioners of Washington County, Maryland ("Washington County" or "the County") intervened in the case.

While the petition for judicial review was pending, Perennial filed a motion for pre-appeal determination challenging the subject matter jurisdiction of the Circuit Court for Washington County on the ground of state law preemption by implication. Prior to considering the merits of the Board's decision, a hearing was held on Perennial's motion. The circuit court granted the motion and determined that Maryland Code, § 7-207 of the Public Utilities Article ("PU") preempts the Washington County Zoning Ordinance and that the Public Service Commission ("PSC") has exclusive jurisdiction to approve the type of

SEGS proposed by Perennial.  Washington County appealed the case to the Court of Special

Appeals.  In a reported opinion, the intermediate appellate court affirmed the judgment of

the circuit court.  *Bd. of Cty. Comm'rs of Washington Cty., et al. v. Perennial Solar, LLC*,

239 Md. App. 380 (2018).

Washington County petitioned this Court for a writ of certiorari.  We granted

*certiorari* to consider the following question:[1]

> Does state law preempt local zoning authority with respect to
> solar energy generating systems that require a Certificate of
> Public Convenience and Necessity issued by the Maryland
> Public Service Commission?

For the reasons set forth herein, we answer in the affirmative and affirm the judgment of

the Court of Special Appeals.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Perennial filed an application in September of 2015 with the Board for a special

exception and variance[2] to construct a SEGS[3] on two contiguous farms totaling 86 acres.

---

[1] We have rephrased the question for clarity.  The question presented in the writ of certiorari was:

> Whether local zoning authority is preempted by state law with
> respect to the approval and location of Solar Energy
> Generating Systems such as the SEGS at issue in this case.

[2] Perennial's variance request was to reduce the internal setback line between the two contiguous properties from the required distance of 50 feet to 0 feet, to allow the rows of solar arrays to cross the property line without interference.

[3] Article 28A of the Washington County Zoning Ordinance defines a SEGS as "a grid-tie solar facility consisting of multiple solar arrays whose primary purpose is to

The farms are adjacent to Cearfoss, a community designated as a Rural Village[4] in the Washington County Comprehensive Plan. The proposed site is located in the Agricultural-Rural ("AR") zoning district[5] in the Washington County Zoning Ordinance ("Zoning Ordinance"). The Zoning Ordinance permits SEGS as a land use in the AR zoning district by special exception. Perennial's SEGS is designed to produce ten megawatts of electricity, all of which is to be sold and transferred offsite to a wholesale electricity market. The electricity generated by the SEGS would be enough to power 2,100 homes.

The Board held a public hearing on Perennial's application in October of 2015. Testimony was given by witnesses in favor of and in opposition to Perennial's application.[6] The Board also accepted written evidence from both sides relating to the application.

---

generate electricity for distribution and/or sale into the public utility grid and not for onside consumption."

[4] The Washington County Comprehensive Plan defines "Rural Villages" as unincorporated areas of the county which "are definable on the landscape and contribute to the unique character of Washington County. They usually include a small core of a residential neighborhood associated with a retail establishment or an institution such as a post office, elementary school, church or fire station." Cearfoss has been designated in the Comprehensive Plan as a Rural Village, which presents an opportunity to provide growth through the use of infill development and utilization of existing infrastructure. The Comprehensive Plan states that "[t]houghtful site planning and design based on the traditional rural character should provide for the commercial needs of the rural area in a manor [sic] that better reflects the rural area's unique and special character."

[5] Under Article 5A of the Washington County Zoning Ordinance, the Agricultural-Rural (AR) zoning district is intended "to provide for continued farming activity and the many uses that do not require public water and sewage facilities and which may be more suitably located outside of the urban-type growth of the larger communities of the County."

[6] The opposition witnesses, many of whom lived in the immediate neighborhood, expressed concerns that the SEGS project would adversely impact their property values,

3

After considering the matter for two weeks, the Board met, deliberated, and granted the request for a special exception and a variance.[7] The Board issued a written opinion in November of 2015 in which it determined, among other things, that the intended use conforms to the Washington County Comprehensive Plan and is compatible with the existing neighborhood. The Board found that the site is not located within a Priority Preservation Area, a Rural Legacy Area, or within the Antietam Overlay Zone, which are all areas where SEGS are prohibited under the Washington County Zoning Ordinance. After describing the evidence and testimony, the Board concluded that there was no probative evidence showing that the SEGS would have any greater adverse effects above and beyond those inherently associated with the special exception use irrespective of its location within the zone. The Board granted the variance from the minimum setback to allow the SEGS to be built over the common property line separating the two contiguous parcels, finding that strict compliance with the setback requirements would cause practical difficulty for the project and that a variance to a zero-foot setback would not cause any harm to public safety or welfare.

A group of aggrieved landowners sought judicial review of the Board's decision in the Circuit Court for Washington County. Washington County intervened in the case. While the petition for judicial review was pending, Perennial filed a motion for pre-appeal

---

create negative visual impacts, generate glare, and create detrimental environmental and health impacts.

[7] The Board granted Perennial's special exception application by a vote of 3-1 and granted the application for a variance by a vote of 4-0.

4

determination challenging the circuit court's subject matter jurisdiction on the ground of state law preemption by implication. Perennial argued that under PU § 7-207, the PSC has exclusive jurisdiction for approval of the proposed SEGS, including site location. Washington County and the aggrieved landowners opposed the motion, arguing that the legislative intent reveals that local regulation of SEGS, and particularly, their location, is not preempted by state law.

After a hearing, the circuit court granted Perennial's motion, holding that local zoning authority is preempted by PU § 7-207. The circuit court dismissed the petition for judicial review and remanded the matter to the Board with instructions to vacate its opinion and the grant of a special exception and variance. Washington County and the aggrieved landowners appealed the decision of the circuit court to the Court of Special Appeals. In a reported opinion, the intermediate appellate court applied Maryland case law outlining the applicable factors when considering the doctrine of implied preemption. *Perennial Solar*, 239 Md. App. 380. The Court of Special Appeals noted that "preemption by implication occurs when a local law 'deals with an area in which the [General Assembly] has acted with such force that an intent by the State to occupy the entire field must be implied.'" *Id*. at 386 (quoting *Talbot Cty. v. Skipper*, 329 Md. 481, 488 (1993)). The Court stated that when undertaking a preemption analysis, its "inquiry is focused on 'whether the General Assembly has manifested a purpose to occupy exclusively a particular field.'" *Id.* (quoting *East Star, LLC v. Cty. Comm'rs of Queen Anne's Cty.*, 203 Md. App. 477, 485 (2012)).

After reviewing the comprehensive statutory scheme associated with the PSC's review and approval process for generating stations, including the broad authority

5

conferred by the General Assembly upon the PSC, the Court of Special Appeals held as follows:

> Based on the comprehensiveness of [PU] § 7-207, local zoning regulations and comprehensive plans are impliedly preempted by state law for SEGSs requiring a CPCN. The statute grants the PSC broad authority to determine whether and where the SEGS may be constructed and operated. It is even more evident that the Legislature intended to have the state govern SEGS approval by requiring local government input into the state's final decision.

*Perennial Solar*, 239 Md. App. at 390. The intermediate appellate court noted that this Court reached the same conclusion in *Howard County v. Potomac Electric Power Co.*, 319 Md. 511 (1990). The Court of Special Appeals concluded its analysis in *Perennial Solar* by stating that "following the logic of the Court of Appeals in *Howard County . . .* and the legislative intent discussed *supra*, we hold that the PSC preempts, by implication, local zoning regulation and thus affirm the circuit court."[8] *Perennial Solar*, 239 Md. App. at 392. For the reasons set forth herein, we affirm the judgment of the Court of Special Appeals.

---

[8] As part of its appeal to the Court of Special Appeals, Washington County argued that Perennial is not governed by the PSC because "[t]he Public Service Commission regulates only solar photovoltaic systems operated by public service companies." *Bd. of Cty. Comm'rs of Washington Cty., et al. v. Perennial Solar, LLC*, 239 Md. App. 380, 392 (2018). The Court of Special Appeals rejected this argument and held that the statute does not limit the PSC's jurisdiction only to public service companies. 239 Md. App.at 392-393. While the issue of the PSC's jurisdiction over the proposed generating stations was not presented in Washington County's Petition for Writ of Certiorari to this Court, the *Amicus Curiae* Petitioners, Queen Anne's County and Kent County raised the issue in their brief and during oral arguments. As discussed *infra*, we agree with the Court of Special Appeals on this point.

## II. STANDARD OF REVIEW

This case involves a purely legal issue—whether PU § 7-207, which grants the PSC general regulatory powers over generating stations, including SEGS, preempts local zoning authority with respect to the location and construction of SEGS. As this determination involves a question of law, our standard of review is *de novo*. *See Koste v. Town of Oxford*, 431 Md. 14, 25 (2013) ("When an issue involves an interpretation and application of a Maryland constitutional, statutory or case law, an appellate court must determine whether the trial court's conclusions are legally correct under a *de novo* standard of review.") (internal citations omitted); *see also Schisler v. State,* 394 Md. 519, 535 (2006).

## III. PARTIES' CONTENTIONS[9]

Perennial's contention is that the PSC's regulatory authority established by the Public Utilities Article over the siting and construction of SEGS preempts local zoning approval by implication. Perennial argues that the General Assembly has given the PSC broad authority to take final action to determine the siting of SEGS which require a certificate of public convenience and necessity, and that the comprehensive nature of the statute indicates the Legislature's intent to occupy the entire field. In support of its position that PU § 7-207 preempts local zoning ordinances in the context of site selection and approval of SEGS, Perennial relies upon *Howard County v. Potomac Electric Power Co.,*

---

[9]*Amicus* briefs were also filed in this case by Queen Anne's County and Kent County (in support of Washington County's position) as well as the Maryland Public Service Commission and the Utility Scale Solar Energy Coalition of Maryland (in support of Perennial's position). We shall collectively refer to Washington, Kent and Queen Anne's County as the "Counties".

*et al.,* 319 Md. 511 (1990), in which this Court held that Article 78, § 54A—the same statute at issue in this case[10]—preempted by implication county zoning ordinances regulating the location and construction of overhead transmission lines in excess of 69,000 volts.

As additional support for its preemption argument, Perennial contends that recent legislative amendments to PU § 7-207 enacted by the General Assembly in 2017 reinforce the Legislature's intent that local governments have an advisory role in the CPCN process, but that the PSC has the ultimate decision-making authority. Perennial further argues that the General Assembly's recent rejection of alternative proposed amendments to PU § 7-207, which would have required that an applicant receive zoning approval from a local government prior to the PSC issuing a CPCN, reinforces the General Assembly's intent to preempt local zoning authority.

Washington County argues that the express power granted by the General Assembly to local and municipal zoning authorities to implement planning and zoning controls has not been expressly or impliedly preempted by state law with respect to the approval and location of SEGS. The County relies upon *Ad + Soil, Inc. v. County Commissioners of Queen Anne's County*, 307 Md. 307 (1986), contending that *Ad + Soil* stands for the proposition that the doctrine of preemption does not allow for preemption in part. Because the General Assembly has prescribed a role for local government in the CPCN process under PU § 7-207, including the consideration of local planning and zoning, the County

---

[10]Article 78 was renamed and re-codified as Public Utilities Article ("PU") § 7-207 as a result of a code revision. 1998 Maryland Laws Ch. 8 (S.B. 1).

8

argues that the General Assembly has not evidenced an unequivocal intent to preempt the "entire field" or to preclude local legislative bodies from enacting any ordinances and laws pertaining to the location of SEGS in their respective jurisdictions.

The County attempts to distinguish *Howard County* on the basis that: (1) the case dealt with the siting and construction of a 500,000 volt transmission line extending for 10.5 miles through two counties, thus differing in scope, size, coverage area, environmental impact, and purpose; (2) under the facts of *Howard County*, PEPCO applied for and received a CPCN well in advance of the county special exception approval processes in the respective jurisdictions; and (3) unlike the Washington County Zoning Ordinance, which permits SEGS by special exception and incorporates compliance with PSC regulations by express reference, the county ordinances at issue in *Howard County* purported to vest extensive authority in the local zoning boards over the construction of overhead transmission lines exceeding 69,000 volts, to the potential impediment of the PSC's discharge of its statutory authority.

Finally, the County argues that the 2017 legislative amendments to PU §7-207, as well as the PSC's own regulations, support the County's position that local zoning ordinances are not preempted by the statutory CPCN application and approval process.

## IV.   DISCUSSION

This Court has frequently explained that Maryland state law may preempt local law in one of three ways: (1) preemption by conflict; (2) express preemption; or (3) implied preemption. *Altadis U.S.A., Inc. v. Prince George's Cty.,* 431 Md. 307, 311 (2013); *Talbot*

*Cty. v. Skipper*, 329 Md. 481, 487-488 (1993); *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 297–298 (1993).

Perennial argues that the local zoning ordinances are preempted by implication. State law can preempt local ordinances by implication when "the ordinance deals with an area in which the General Assembly has acted with such force that an intent to occupy the entire field must be implied." *Howard Cty.*, 319 Md. at 522 (cleaned up) (quoting *Bd. of Child Care, et al. v. Harker, et al.,* 316 Md. 683, 697 (1989)); *see also Talbot Cty. v. Skipper*, 329 Md. at 488.

There is no particular formula for determining whether the General Assembly intended to preempt an entire area. *Howard Cty.*, 319 Md. at 523. Nevertheless, we have stated repeatedly that "[t]he primary indicia of legislative purpose to preempt an entire field of law is the comprehensiveness with which the General Assembly has legislated in the field." *Id*. (quoting *Bd. v. Harker,* 316 Md. at 696–697); *see also Altadis*, 431 Md. at 316 (holding that state law comprehensively regulated the packaging, sale, and distribution of tobacco products, and thus, preempts county ordinances regulating the packaging of cigars); *Skipper*, 329 Md. at 489, 492 (holding that state comprehensive legislation regulating virtually all aspects of sewage sludge utilization was "strongly indicative of the legislative intent to preempt this entire field from local regulation"); *Allied Vending*, 332 Md. at 310 (holding that the "General Assembly has manifested an intent for the State to completely occupy the field of the sale of cigarettes through vending machines rendering any local or municipal ordinances in this area constitutionally invalid").

10

In addition to reviewing the comprehensiveness of the legislation that is the subject of the preemption analysis, in *Allied Vending,* we summarized the secondary factors in which the Court has previously considered in determining whether a local law is preempted by implication:

> 1) whether local laws existed prior to the enactment of state laws governing the same subject matter, 2) whether the state laws provide for pervasive administrative regulation, 3) whether the local ordinance regulates an area in which some local control has traditionally been allowed, 4) whether the state law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances, 5) whether a state agency responsible for administering and enforcing the state law has recognized local authority to act in the field, 6) whether the particular aspect of the field sought to be regulated by local government has been addressed by state legislation, and 7) whether a two-tiered regulatory process existing if local laws were not preempted would engender chaos and confusion.

*Allied Vending*, 332 Md. at 299–300 (internal citations omitted).

With the principles of implied preemption in mind, we turn to the language of the Public Utilities Article and consider the duties and authority delegated to the PSC by the General Assembly in the area of solar energy generating station approvals.

## A.     Statutory Framework of the Public Utilities Article

In response to the growing concern over climate change, the Maryland General Assembly enacted legislation intended to reduce Maryland greenhouse gas emissions. The legislation included a specific intent to move the Maryland energy market away from

11

historical reliance on fossil fuels and enacted a Renewable Energy Portfolio Standard ("RPS")[11]. *See* Maryland Code, Environment Article ("EN") § 2-1201, *et seq.*; PU § 7-701.

The RPS statute, PU § 7-701, *et seq.*, was originally enacted in 2004 to facilitate the State's transition to renewable energy sources. The objective of the RPS statute is to recognize and develop the benefits associated with a diverse collection of renewable energy supplies to serve Maryland. As part of its enactment, the General Assembly specifically determined that: "the benefits of electricity from renewable energy resources, including long term decreased emissions, a healthier environment, increased energy security, and decreased reliance on and vulnerability from imported energy sources, accrue to the public at large;" and that the State needed to "develop a minimum level of these resources in the electricity supply portfolio of the State." PU § 7-702(b). The RPS includes specific targets for the share of electricity coming from solar electric generation. PU § 7-703.

In 2009, the Maryland General Assembly enacted the Greenhouse Gas Emissions Reduction Act of 2009 ("GRRA"), a law that requires the State to reduce greenhouse gas emissions from a 2006 baseline by 25% by 2020 and by 40% by 2030. EN §§ 2-1204, 2-1204.1; PU § 7-701, *et seq.* During the 2019 legislative session, the General Assembly adopted the Clean Energy Jobs Act, which increases the State's RPS target to 50% by 2030. Senate Bill ("S.B.") 516, 2019 Reg. Sess. (cross-filed as H.B. 1158). The Clean Energy

---

[11] "Renewable energy portfolio standard" is defined as "the percentage of energy sales at retail in the State that is to be derived from Tier 1 renewable sources and Tier 2 renewable resources in accordance with §7-703(b) of this subtitle." PU § 7-701(o). Solar energy is a Tier 1 renewable resource. PU § 7-701(r).

Jobs Act also includes a significant increase in electricity sales derived from solar energy from 1.9% to 5.5% in 2019, and to 14.5% in 2028. *Id.*

The General Assembly has delegated to the PSC[12] the authority to "implement a renewable energy portfolio standard" that applies to retail electricity sales in the State by electricity suppliers consistent with the specific timetable established by the statute. PU § 7-

---

[12] The Maryland Public Service Commission is an independent unit of the Executive Branch of State Government of Maryland. PU § 2-101, *et seq.* Pursuant to PU § 2-112, the General Assembly has conferred upon the PSC broad jurisdiction and broad general powers over "each public service company that engages in or operates a utility business in this State. . .," which applies "[t]o the full extent that the Constitution and laws of the United States allow . . . ." It is undisputed that Perennial is not a "public service company" as defined by PU § 1-101(x). Queen Anne's County and Kent County argue that the PSC lacks jurisdiction over companies like Perennial, which undertake large scale solar projects because they do not fall within the definition of "public service companies." We do not read the statute so narrowly. The Legislature has expressly stated that the specific regulatory and supervisory powers over public utility companies do not limit the "general powers and duties" of the PSC provided for elsewhere in the statute. *See* PU § 2-113(b). One such general power and duty delegated to the PSC is the specific regulatory authority to approve "generating stations" through the certificate of public convenience and necessity ("CPCN") process. *See* PU § 7-207. Under the statute, "a person may not begin construction in this State of a generating station" until a CPCN is obtained. PU § 7-207(b)(1)(i). A "person" is defined as an "individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any partnership, firm, association, corporation, or other entity." PU § 1-101(u). Accordingly, we disagree with the assertion that the applicable statute (PU § 7-207) only applies to public service companies. Perennial is "a person" seeking to construct a generating station in Maryland and therefore, is required to obtain a CPCN from the PSC. The PSC's jurisdiction over solar photovoltaic systems is also evident from the fact that the General Assembly created an exception from the CPCN process for certain smaller scale solar facilities. *See* PU §§ 7-207(b)(1)(ii); 7-207.1(a) (creating an exemption process from the CPCN requirement for certain on-site generators); PU § 7-207.2(a) (imposing a deposit requirement for a generating station exempted under § 7-207.1 that "has the capacity to produce at least 2 megawatts of electricity from a ***solar photovoltaic system***") (emphasis added). The General Assembly would not have created an exemption for certain solar facilities from the CPCN requirements if solar facilities were not subject to the CPCN requirements in the first place.

703(a). On an annual basis, the PSC is required to report to the General Assembly on the status of the implementation of the RPS program, including the availability of Tier 1 renewable sources such as solar energy. PU § 7-712.

Consistent with the PSC's duties to ensure compliance with the RPS, including the specific targets for the share of electricity coming from solar electric generation, the General Assembly has also delegated to the PSC the exclusive authority to approve generating stations[13] in Maryland. Unless exempt by the statute,[14] a generating station cannot be constructed unless the PSC issues a CPCN, which is only issued after a detailed application and approval process. PU § 7-207.

---

[13] While the statute does not define "generating station," the regulations promulgated by the PSC define a "generating station" as: "property or facilities located in Maryland constituting an integral plant or unit for the production of electric energy, including any new production unit that would be added to an existing production plant." Code of Maryland Regulations ("COMAR") 20.79.01.02.B(11)(a). Because Washington County's Zoning Ordinance refers to "SEGS" and the PU and COMAR refer to "generating stations," we use both terms herein when discussing the respective statute and ordinance. Perennial's SEGS proposal clearly falls within the definition of "generating station" under COMAR.

[14] The General Assembly has created exemptions from the CPCN process for certain generating stations. PU § 7-207.1(a) creates an exemption from the CPCN requirement for certain generating stations that: (i) produce less than 70 megawatts and use at least 80% of the electricity on-site; (ii) are land-based and produce electricity from wind, provided that the capacity of the generating station does not exceed 70 megawatts; or (iii) produce less than 25 megawatts and use at least 10% of the electricity produced onsite. PU § 7-207.2 allows an exemption for generating stations that produce at least 2 megawatts of power and are exempt from the CPCN permit process by PU § 7-207.1. That is, the system must use at least 10% of the electricity produced on site. Under either of the exemption sections, while an application is not required to obtain a CPCN, the applicant must still apply for and receive PSC approval of the exemption. In considering the exemption, the PSC approves the safety of the system, but not the location. In the instant case, neither of the exemptions is applicable and the SEGS require a CPCN from the PSC. Washington County concedes that the SEGS proposed by Perennial require a CPCN from the PSC.

14

The PSC's review process of a generating station is extensive. Upon receipt of an application, the PSC provides notice of the application to: (i) the Maryland Department of Planning; (ii) the governing body, and if applicable, the executive of each county or municipal corporation in which a portion of the generating station is proposed to be constructed; (iii) the governing body of any county or municipal corporation within one-mile of the proposed location of the generating station; (iv) each member of the General Assembly representing any part of the county in which any portion of the generating station is proposed to be constructed; (v) each member of the General Assembly representing any portion of each county within one-mile of the proposed location of the generating station; and (vi) all other interested persons. PU § 7-207(c)(1). A copy of the application is also provided to each appropriate State unit and unit of local government for review, evaluation, and comment regarding the significance of the proposal to the State, area wide, and local plans or programs (*see* PU § 7-207(c)(2)), and to each member of the General Assembly who is provided with the statutory notice pursuant to PU § 7-207(c)(1). *Id.*

The statute requires that the PSC coordinate with and include the local governing body of the county or municipality in the CPCN public hearing process, and establishes a public hearing framework designed to ensure input and public comment from interested persons in the geographic area within which the generating station is being proposed:

> (d) *Public hearing*. – (1) The Commission shall provide an opportunity for public comment and hold a public hearing on the application for a certificate of public convenience and necessity in each county and municipal corporation in which any portion of the construction of a generating station . . . is proposed to be located.

15

(2) The Commission shall hold the public hearing jointly with the governing body of the county or municipal corporation in which any portion of the construction of the generating station . . . is proposed to be located, unless the governing body declines to participate in the hearing.

(3)(i) Once in each of the 4 successive weeks immediately before the hearing date, the Commission shall provide weekly notice of the public hearing and an opportunity for public comment:

> 1. by advertisement in a newspaper of general circulation in the county or municipal corporation affected by the application;
> 2. on two types of social media; and
> 3. on the Commission's website.

(ii) Before a public hearing, the Commission shall coordinate with the governing body of the county or municipal corporation in which any portion of the construction of the generating station . . . is proposed to be located to identify additional options for providing, in an efficient and cost effective manner, notice of the public hearing through other media types that are familiar to the residents of the county or municipal corporation.

PU § 7-207.

Under the express language of the PU, the PSC is the final approving authority for the siting and construction of generating stations, which require a CPCN, after giving "due consideration" to the following statutory factors:

(e) *Final action by Commission*. – The Commission shall take ***final action*** on an application for a certificate of public convenience and necessity only after ***due consideration*** of:

(1) the recommendation of the governing body of each county or municipal corporation in which any portion of the construction of the generating station . . . is proposed to be located;

16

(2) the effect of the generating station . . . on:
  (i)   the stability and reliability of the electric system;
  (ii)  economics;
  (iii) esthetics;
  (iv)  historic sites;
  (v)   aviation safety as determined by the Maryland Aviation Administration and the administrator of the Federal Aviation Administration;
  (vi)  when applicable, air quality and water pollution; and
  (vii) the availability of means for the required timely disposal of wastes produced by any generating station; and

(3) for a generating station:
  (i)   the consistency of the application with the comprehensive plan and zoning of each county or municipal corporation where any portion of the generating station is proposed to be located; and
  (ii)  the efforts to resolve any issues presented by the county or municipal corporation where any portion of the generating station is proposed to be located.

PU § 7-207 (emphasis added).

## B.   Applicable Provisions of the Washington County Zoning Ordinance

Not surprisingly, as the State's energy market moves toward renewable energy sources, such as solar energy, land use conflicts often arise, particularly in rural areas where land historically zoned for agricultural use is proposed as a site for large scale solar projects. With the proliferation of solar facilities, counties such as Washington, Kent and Queen Anne's Counties (collectively, "the Counties") have adopted specific solar regulations as part of their planning and zoning authority.[15]

---

[15] In 2011, each of these jurisdictions adopted amendments to their respective land use ordinances identifying suitable locations for utility scale solar facilities in their

17

The Counties argue that PU § 7-207 does not preempt their right to regulate SEGS through their planning and zoning authority conferred by the Express Powers Act, Maryland Code, Local Government Article ("LG") § 10-324(b)(1), in which the General Assembly has determined that it is a state policy that "the orderly development and use of land and structures requires comprehensive regulation through the implementation of planning and zoning controls." The General Assembly has expressly delegated planning and zoning authority to local government. LG § 110-324(b)(2); Maryland Code, Land Use Article ("LU") § 4-101(a)(2).

As part of our preemption analysis, we must consider the provisions of the Washington County Zoning Ordinance, which the County contends apply to Perennial's SEGS application in this instance.

### *Zoning Ordinance Provisions Specific to SEGS*

The pertinent provision of the County's Zoning Ordinance is Section 4.26, added by amendment in 2011, which permits SEGS as a land use by special exception in certain zoning districts in the County.[16]

Section 4.26 of the Zoning Ordinance also provides specific design standards for SEGS, including minimum lot size, buffer yards, controlled access, electrical wire placement, diffused lighting and glare, appearance, color and finish, signage, noise,

---

counties, and also adopted setbacks from neighboring properties and public roads, as well as rigorous landscaping and screening requirements intended to preserve agricultural vistas and the views of neighboring property owners.

[16] Under the County's Zoning Ordinance, SEGS are prohibited as a use in Priority Preservation Areas, Rural Legacy Areas, and Antietam Overlay Zones.

electromagnetic interference, code compliance, and the establishment of a reclamation or decommissioning plan. The design standards also expressly require that the SEGS comply with PSC regulations. Zoning Ordinance, Section 4.26(A)(13). The standards also require that an applicant obtain PSC approval for a CPCN-exempt SEGS prior to construction and the issuance of a county building permit. *Id.,* Section 4.26(A)(14).

### *Standards Governing Special Exceptions*

As noted *supra*, SEGS are permitted in the Agricultural (Rural) Zoning District by special exception. Under Article 28A of the Zoning Ordinance, a "special exception" is defined as "[a] grant of a specific use that would not be appropriate generally or without restriction; and shall be based upon a finding that the use conforms to the plan and is compatible with the existing neighborhood." Section 25.6 of the Zoning Ordinance sets forth the standards which the Washington County Board of Zoning Appeals is required to apply when considering a special exception application:

> Where in these regulations certain powers are conferred upon the Board or the approval of the Board is required before a permit may be issued, or the Board is called upon to decide certain issues, the Board shall study the specific property involved, as well as the neighborhood, and consider all testimony and data submitted, and shall hear any person desiring to speak for or against the issuance of the permit. However, the application for a permit shall not be approved where the Board finds the proposed building, addition, extension of building or use, sign, use or change of use would adversely affect the public health, safety, security, morals or general welfare, or would result in dangerous traffic conditions, or would jeopardize the lives or property of people living in the neighborhood. In deciding such matters, the Board shall consider any other information germane to the case and shall give consideration to the following, as applicable:

(a) The number of people residing or working in the immediate area concerned.

(b) The orderly growth of a community.

(b) Traffic conditions and facilities.

(c) The effect of such use upon the peaceful enjoyment of people in their homes.

(e) The conservation of property values.

(f) The effect of odors, dust, gas, smoke, fumes, vibrations, glare[,] and noise upon the use of surrounding property values.

(g) The most appropriate use of land and structure.

(h) Decision of the courts.

(i) The purpose of these regulations as set forth herein.

(j) Type and kind of structures in the vicinity where public gatherings may be held, such as schools, churches and the like.

The special exception factors are applied by the Board against the backdrop of the case law governing special exceptions. The seminal case in Maryland on special exceptions is *Schultz v. Pritts*, 291 Md. 1 (1981). *See People's Counsel v. Loyola Coll.*, 406 Md. 54 (2008) (describing *Schultz* and its progeny). In *Schultz*, the Court summarized the special exception use as follows:

> The special exception use is part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption. The

duties given the Board are to judge whether the neighboring properties in the general neighborhood would be adversely affected and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

291 Md. at 11; *see also Loyola*, 406 Md. at 88.

### *Standards Governing Variances*

Perennial's application involved not only a special exception but also a request for a variance from the strict application of the Zoning Ordinance to enable Perennial to construct its solar arrays over the internal property lines. We have held that "[a] variance refers to administrative relief which may be granted from the strict application of a particular development limitation in the zoning ordinance (i.e., setback, area and height limitations, etc.)." *Mayor & Council of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514, 537 (2002) (quoting Stanley D. Abrams, *Guide to Maryland Zoning Decisions,* § 11.1 (3d ed., Michie 1992)). To obtain a variance under the Washington County Zoning Ordinance, the applicant must satisfy the following criteria:

A. Practical Difficulty

1. Strict compliance would unreasonably prevent the use of the property for a purposed purpose or render conformance unnecessarily burdensome;

2. Denying the variance would do substantial injustice to the applicant and a lesser relaxation than that applied would not give substantial relief; and

3. Granting the variance would observe the spirit of the Ordinance and secure public safety and welfare.

B. Undue Hardship

21

1. Strict compliance with the Ordinance would prevent the applicant from securing a reasonable rate of return from or to make reasonable use of the property; and

2. The difficulties or hardships are peculiar to the property and contrast with those of other property owners in the same district; and

3. The hardship is not the result of the applicant's own actions.

Zoning Ordinance § 25.56.

### *Board of Zoning Appeals Process and Procedures*

Before an applicant receives a special exception or a variance, a hearing must be held before the Board of Zoning Appeals, where "any party may appear and be heard in person or by agent or attorney." Zoning Ordinance § 25.52. Prior to the hearing, the property which is the subject of the application is posted with a zoning notice describing the requested relief, and the public hearing is advertised in two consecutive issues of a newspaper having a general circulation in the County at least 15 days prior to the hearing. *Id.* After a public hearing, the Board is required to render a decision within 30 days. Zoning Ordinance § 25.55. Any person or persons aggrieved by the decision of the Board may appeal that decision to the Circuit Court for Washington County in the manner prescribed by LU § 4-401.

### C. Preemption Analysis

Comparing the comprehensive provisions of PU § 7-207 against the applicable provisions of the Zoning Ordinance, both the statute enacted by the General Assembly and the local ordinance adopted by the County attempt to regulate the siting and location of

SEGS. Under the statute, the PSC is given the final authority to approve the location of SEGS, while under the Zoning Ordinance, the Board has the final authority to approve site-specific special exceptions and variances for the construction of SEGS. Clearly, only one of these bodies can have the final say on the matter.

### *The Comprehensive Statutory Scheme of Solar Energy Regulation Pursuant to PU § 7-207*

Applying the principles of implied preemption to PU § 7-207, it is clear that the General Assembly intended to vest final authority with the PSC for the siting and location of generating stations requiring a CPCN. The statute manifests the general legislative purpose to create an all-compassing statutory scheme of solar energy regulation. That statute is "extensive and embrace[s] virtually the entire area involved." *Howard Cty.*, 319 Md. at 523 (quoting *Nat'l Asphalt v. Prince George's Cty.*, 292 Md. 75, 78 (1981)).

The statute grants the PSC broad authority to determine whether and where SEGS may be constructed. In making such a determination, the PSC undertakes a multi-faceted review, which includes input from other state agencies, as well as from local government. In addition to considering the recommendations of other state agencies, the PSC is also required to consider the stability and reliability of the system; economics; esthetics; historic sites; aviation safety; air quality and water pollution; and the availability of means of the required timely disposal of wastes produced by any generating station. PU § 7-207(e)(2). Ultimately, the final decision regarding whether to approve a generating station lies exclusively with the PSC.

23

The General Assembly's intent to preempt local government's zoning approval authority over generating stations is clear from the plain text of the statute, which specifically defines the role of local government, as well as planning and zoning considerations, in the PSC review and approval process. Contrary to Washington County's "all or nothing" approach to preemption, the General Assembly has carved out a key role for local government in the PSC's review and approval process.

For example, as part of the CPCN application process, the PSC holds public hearings within each local jurisdiction where the construction is proposed, with the governing body of the local jurisdiction invited to jointly preside over and participate in those hearings. PU §7-207(d). Local land use interests are also designated by statute as a factor requiring "due consideration" by the PSC in evaluating and approving generating stations. This includes the "***recommendation*** of the governing body of each county or municipal corporation in which any portion of the construction of the generating station . . . is proposed to be located," PU §7-207(e)(1), as well as several other factors typically considered in local land use decisions, including esthetics, historic sites, pollution, and waste disposal. PU §7-207(e)(2) (emphasis added). Although the local governing body's recommendations are contemplated with "due consideration", the final determination whether to approve a CPCN for SEGS is ultimately made by the PSC.

### *Application of Secondary Factors in Preemption Analysis*

While our review of the comprehensive nature of PU § 7-207 leads us to our conclusion that the General Assembly has acted with such a force in this field that local zoning authority over generating systems is impliedly preempted, our conclusion is further

24

bolstered by our consideration of the secondary factors that we summarized in *Allied Vending*, 332 Md. at 299–300.

First, as stated above, "state law . . . provide[s] for pervasive administrative regulation." *Id.* PU § 7-207 addresses all regulatory matters associated with the approval and operation of generating stations, including siting and locational approvals.

Second, the statute does not "expressly provide concurrent legislative authority to the local jurisdiction or require compliance with local planning and zoning ordinances." *Allied Vending*, 332 Md. at 299–300. To the contrary, the statute expressly identifies the local governing body's role as a participant in a public hearing process, with the ability to make a "recommendation," which the PSC is required to give "due consideration" before taking "final action". *See* PU § 7-207(a) and (b). Nor does the statute require that the applicant receive zoning approval in connection with the CPCN application. Moreover, as noted *infra*, in 2017 and 2019, the General Assembly expressly rejected bills intended to amend the statute to require compliance with local planning and zoning ordinances.

Third, "the particular aspect of the field sought to be regulated by the local government"—comprehensive planning and local zoning regulations—"ha[s] been addressed by the state legislation." *Allied Vending*, 332 Md. at 299. The statute gives the PSC the final approval authority over the siting and location of generating stations—the same authority sought to be exercised by the local government as part of its special exception and variance process. The statute also specifically addresses the role of the comprehensive plan and local zoning regulations in the PSC approval process, which is that they must be given "due consideration" by the PSC. The statute, however, does not

25

mandate or otherwise require that the local zoning authority approve a generating station prior to PSC approval.

Finally, a two-tiered regulatory process as proposed by the County "would engender chaos and confusion" if local zoning authority was not preempted. *Id.* at 300. Under the Zoning Ordinance, the Board's process for approving a variance and special exception for Perennial's SEGS is a process for approving the ***siting and location*** of a SEGS on a particular property. The Board is required to consider and apply the comprehensive plan and the zoning ordinance when considering the application. That process requires a public hearing and a final decision by the Board, which is appealable to the circuit court.

By comparison, the PSC approval process also involves a determination of whether to approve a SEGS at a particular location.[17] Thus, a two-tiered process could create confusion, particularly if the Board does not grant the special exception or variance, or establishes conditions for the use that are inconsistent with the PSC's ultimate approval.[18] Such an interpretation is consistent with the plain language of the statute, which vests in

---

[17] As noted *supra,* under PU § 7-207, the PSC is required to consider many of the same factors considered by the Board, including the comprehensive plan and zoning, as well as esthetics, impact on historical sites, and adverse environmental conditions. Similarly, the PSC process involves a public hearing in the jurisdiction in which any portion of the SEGS will be located.

[18] Indeed, it is easy to imagine future scenarios procedurally similar to this case, where aggrieved property owners appeal to the circuit court to challenge a Board of Appeals decision before the applicant obtains a CPCN from the PSC as the ultimate approving authority. The plain language of the statute does not contemplate such a dual process.

26

the PSC the authority to take "final action" after giving due consideration to the local comprehensive plan and zoning regulations.

### *Recent Legislative Attempts to Clarify the Role of Local Planning and Zoning in Solar Facilities Approvals*

Our holding that the General Assembly's intent to preempt local comprehensive planning and zoning on matters related to the ultimate siting and construction of generating stations is bolstered by the recent amendments to the statute, as well as our consideration of the proposed bills, which were rejected. In 2017, the General Assembly further clarified the role of the local comprehensive plan and zoning regulations and local government input in the PSC's solar energy approval process. Specifically, the General Assembly added language to the statute requiring that the PSC give "due consideration" to the following additional factors, prior to taking final action on an application for a CPCN for a generating station:

> (i) the consistency of the application with the comprehensive plan and zoning of each county or municipal corporation where any portion of the generating station is proposed to be located; and
>
> (ii) the efforts to resolve any issues presented by the county or municipal corporation where any portion of the generating station is proposed to be located.

PU § 7-207(e)(3) (the "2017 Amendment").

The 2017 Amendment was the result the adoption of 2017 Maryland Laws Ch. 392 (H.B. 1350) ("HB 1350"). At the same time the General Assembly was considering HB 1350, it also considered a competing bill, 2017 H.B. 1592/S.B. 931 ("HB 1592"). The differences in the competing bills are also instructive to our preemption analysis. *See*

27

*Altadis*, 431 Md. at 319 ("The General Assembly's rejection of bills imposing the same requirements as the local legislation is significant in a preemption analysis.") (citing *Allied Vending, supra.,* 332 Md. at 304; *Skipper*, *supra*, 329 Md. at 493).

As originally drafted, HB 1592 would have, among other things: (1) authorized counties to adopt specific zoning regulations for the siting of generating stations; (2) allowed counties to identify viable generating station sites in their respective jurisdictions; and (3) limited the PSC's ability to "preempt a local jurisdiction's zoning regulations" to circumstances where the PSC "determines that a proposed generating station is vital to grid integrity; and . . . there is not a viable alternative site authorized under the zoning regulations." Therefore, had HB 1592 been enacted, the PSC's authority to preempt local zoning regulations would have been significantly restricted.

Instead, the General Assembly enacted HB 1350, which does not limit the PSC's authority to preempt local zoning laws, and instead requires that the PSC give "due consideration" to the comprehensive plan and zoning laws of the applicable local jurisdiction prior to taking final action. By enacting the 2017 Amendment, the General Assembly recognized the importance of the local comprehensive plan and zoning regulations in considering the placement of SEGS. However, the 2017 Amendment fell short of shifting the final approving authority from the PSC to the local government for the siting and location of SEGS.

During the 2019 legislative session, the General Assembly once again considered the respective roles of the PSC and the local government at the crossroads of energy policies and local land use concerns. Specifically, the Legislature considered

28

H.B. 1227/S.B. 997 ("HB 1227"), which would have amended PU § 7-207(e) to require that the PSC receive from local government "a written statement that the proposed generating station conforms with all applicable county or municipal zoning land use requirements" before the PSC could issue a CPCN for a solar photovoltaic system or wind system.[19]  Recognizing that HB 1227 would alter the PSC's preemptive authority, the Fiscal and Policy Note associated with HB 1227 stated that "[i]n practical terms, the bill *establishes local preemption authority* for the siting of solar and wind facilities in the State." *Id.* (emphasis added).  Notably, had HB 1227 been enacted, local zoning approval would have been required as a condition precedent to PSC approval and local zoning would have preempted the PSC's approval on matters related to the siting or location of solar facilities.  HB 1227 was defeated in committee.[20]

This recent legislative history is significant in our preemption analysis.  "If the General Assembly intended to change the existing law" governing the siting of generating stations to require zoning approval by the local government in addition to PSC approval, "it certainly had the opportunity to do so.  The failure to enact such measures 'strongly

---

[19] During oral arguments, counsel for Queen Anne's County and Kent County advised that he drafted this legislation, which was submitted by the Eastern Shore Delegation in direct response to the Court of Special Appeals' preemption holding in this case. *See Perennial Solar*, 239 Md. App. 380.  The General Assembly had the opportunity to give local government greater control over the location of solar facilities and declined to take such action.

[20] While typically a bill is assigned to one standing committee, given the overlapping jurisdiction, this particular bill was assigned to two committees—the House Environment and Transportation Committee, which voted 17-5 against the bill, and the House Economic Matters Committee, which voted 15-6 against the bill.

suggests that there was no intent to allow local governments to enact different . . . requirements.'" *Allied Vending*, 332 Md. at 304 (citing *Skipper, 329 Md.* at 493); *see also Altadis*, 431 Md. at 319 (stating that in finding that the state statute governing the sale of tobacco products preempted a local ordinance, which disallowed the sale of single cigars, this Court held that "it is noteworthy that the General Assembly has considered bills prohibiting the sale of single cigars, but they have failed to pass").

Considering the 2017 Amendment that was approved and enacted by the General Assembly, as well as the two bills that were considered but not enacted in the 2017 and 2019 legislative sessions, we conclude that the General Assembly firmly intended that PU § 7-207 preempt by implication local zoning approval authority over SEGS.

### Consideration of our Holding in Howard County v. Potomac Power and Electric and other Preemption Cases

While our independent review of PU § 7-207 has caused us to conclude that the statute preempts local zoning authority with respect to the siting and location of SEGS that require CPCN approval by the PSC, it is important to note that our holding is consistent with *Howard County v. Potomac Electric Power Co.*, 319 Md. 511 (1990) with respect to PSC approval of certain electric transmission lines.

In *Howard County*, this Court was asked to determine whether authority granted to the PSC under Article 78, and § 54A in particular (now PU § 7-207) preempted local land use and zoning ordinances regulating the location and construction of certain electric transmission lines. In that case, the PSC issued a CPCN to Potomac Electric Power Co. ("PEPCO") authorizing the construction of overhead transmission lines designed to carry

30

in excess of 69,000 volts. *Id.* at 514. PEPCO then filed a petition with the Boards of Appeal for both Montgomery and Howard counties for special exceptions under the respective zoning ordinances, to permit the construction of the transmission lines in each county. *Id.* at 514-517. The Montgomery County Board of Appeals granted the special exception with conditions, while the Howard County Board of Appeals denied it. *Id.*

On appeal of both decisions, this Court analyzed the extensive power granted to the PSC under Article 78, § 54A and held that the statute impliedly preempted local zoning authority over transmission lines. *Id.* at 524. In finding that the General Assembly had preempted local zoning authority over the siting and location of transmission lines, this Court held that: "[i]n this case, it is clear that, in the field of public utility service, the General Assembly intended to grant broad powers to the PSC to execute its principal duty of assuring adequate electrical service statewide." *Id.* In reviewing the comprehensiveness of the PSC statute governing generating stations and transmission lines, we noted that the General Assembly had given local governing bodies an advisory role in the process:

> The provisions of Article 78, and in particular § 54A make no reference to local governing bodies; the only language giving recognition to local authorities in the proceedings for granting a certificate of public convenience and necessity is that in § 54A which states that the PSC shall make its determination after 'due consideration of the recommendations of such governing bodies.' Manifestly, this language implies that the regulations from other state agencies and local governing bodies are advisory only and not controlling.

*Id.* at 525–526.

We also expressed a concern that the two-tiered regulatory process proposed by the counties involving both the CPCN process at the PSC level, and a special exception process

31

at the county zoning level, could generate confusion and complications, noting that "[n]ot only could counties impose special conditions upon utilities seeking to construct transmission lines, but an individual county could effectively thwart the line's construction even after the utility had been granted a certificate by the PSC." *Id.* at 527.

Acknowledging the counties' participatory role and their ability make recommendations during the PSC public hearing process, we noted that this mechanism "eliminat[ed] the potential for dual application procedures which may result in irreconcilably conflicting results. . ." *Id.* at 528. This Court further recognized that some of the zoning regulations addressed the same considerations set forth in the statute. *Id.* We also found that "[w]hen such an exercise of local authority obstructs the fundamental purpose of Article 78, we must conclude that these local powers were not intended to exist concurrently with those of the PSC." *Id.*

Similar to the Counties' argument in this case, in *Howard County*, the counties argued that under their home rule charters, their zoning powers emanate from the authority granted under the Express Powers Act, LG § 10-324, and that under *Ad + Soil*, "evidence of a countervailing legislative purpose to prohibit local zoning control 'must be very strong indeed.'" *Id*. (*citing Ad + Soil*, 307 Md. at 334). In response to the counties' argument, we held that "[w]hile that assertion may be true in the context of many areas of legislation, it is not so in the field of regulation broadly entrusted to the PSC." *Id.* at 528–529. We stated that under the Express Powers Act, the statute provides that "the powers granted to the county pursuant to this paragraph shall not be construed . . . [t]o preempt or supersede the regulatory authority of any State department or agency under any public general law."

*Id.* (*quoting* the Express Powers Act, formerly Article 25A, § 5(X)(2)(v), now LG § 10-324(c)(4)). We held that "allowing counties to require special permits of utility companies even after they qualify for a certificate from the PSC would sanction an authority superior to that of the PSC. In such cases, the statutory powers of the PSC would effectively be bridled if its decisions contravened the actions of local bodies." *Id.* at 529.

Washington County argues that *Howard County* is distinguishable from this case in three ways. First, Washington County argues that *Howard County* should not control the preemption analysis because that case dealt with the siting and construction of a 500,000-volt transmission line running 10.5 miles through two counties. The County argues that the Court should decline to follow *Howard County* because the projects differ significantly in scope, size, coverage area, environmental impact, and purpose. SEGS of the type at issue in this case are generally small facilities with local impact as opposed to multi-jurisdictional or regional infrastructure. Accordingly, the County argues that the determination of compatibility for siting such facilities is particularly apt for the exercise of local zoning authority.

While it is true that transmission lines may be different from generating stations as far as their scope, size, coverage area, environmental impact, and purpose, the General Assembly has enacted a statute creating the same approval process for both types of structures, with the PSC as the final approving authority for their siting and location. *See* PU § 7-207, titled "Generating stations or transmission lines – General certification procedure." The General Assembly has chosen to treat the approval of transmission lines

33

and generating stations, including large scale solar projects, in the same manner, and it is not within our province to change it.

Washington County's second attempt to distinguish *Howard County* is based on its procedural history. In *Howard County*, PEPCO received its CPCN and subsequently applied for its special exceptions. Here, Perennial applied for and received its special exception and variance prior to receiving its CPCN. We do not find significance in the order in which approvals were sought or obtained. Under either scenario, the local government could deny a special exception application for the generating station that is approved by the PSC, thereby "sanction[ing] an authority superior to that of the PSC. In such cases, the statutory powers of the PSC would be effectively bridled if its decisions contravened the actions of local bodies." *Howard County*, 307 Md. at 529. To condition the construction of a SEGS upon the approval of a special exception or variance by the Board of Zoning Appeals is antithetical to the express language of PU § 7-207(e), which vests final approval with the PSC.

Finally, Washington County attempts to distinguish *Howard County* by suggesting that the county zoning ordinances in that case purported to vest extensive authority in the local zoning boards over the construction of overhead transmission lines exceeding 69,000 volts to the potential impediment of the PSC's discharge of its statutory authority. In contrast, here, the County's Zoning Ordinance permits SEGS by special exception and incorporates compliance with PSC regulations by express reference.

While there are differences between the Washington County Zoning Ordinance and the county zoning ordinances at issue in *Howard County*, such differences do not change

our analysis. In *Howard County* as well as the instant case, if the Board of Appeals denied an applicant's request, the Board would be the final approving authority rather than the PSC. Such a result is inconsistent with the authority granted under the statute to the PSC.

Washington County also argues that under *Ad + Soil*, preemption can only occur when the General Assembly reserves for itself "***exclusive*** dominion over an ***entire field*** of legislative concern" and that "[w]hen properly invoked, the doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted field." 307 Md. at 324 (emphasis added). The County argues that because the statute contemplates recommendations from the local legislative body, as well as consideration of the comprehensive plan and zoning, under the plain reading of *Ad + Soil*[21], there can be no preemption because the doctrine of preemption, as articulated by this Court, does not allow for preemption in part.

---

[21] In *Howard County*, 319 Md. 511 (1990), we noted that there were several key distinctions between the statute governing sludge storage and distribution facilities which was the subject of *Ad + Soil,* and the comprehensive statute governing the PSC's approval of electric transmission lines. Specifically, we noted that the statute in *Ad + Soil* did "not purport to regulate the actual *location* of sludge utilization sites, or the *construction* or *arrangement* of facilities on such sites." *Id.* at 526 (emphasis in original) (citing *Ad + Soil*, 307 Md. at 333). By contrast, in *Howard County*, we noted that Article 78 gave the PSC the specific authority to approve the location of transmission lines. Another significant distinction is that in *Ad + Soil*, the statute at issue specifically provided that the Department of Health and Mental Hygiene was not permitted to issue a permit for the sewage sludge composting facility "unless the facility complie[d] with all applicable county zoning and land use requirements and [was] not opposed by the local legislative body." *Id.* at 525 (citing *Ad + Soil*, 307 Md. at 327). PU § 7-207 contains no such requirements. Indeed, these are the very standards that were proposed by the Counties to be added to the statute in the 2019 legislation session, which failed in legislative committee.

We do not find the County's "all or nothing" preemption argument persuasive considering the specific language in the Public Utilities Article which expressly defines an advisory role for local government in the CPCN process, and which identifies planning and zoning matters as being significant factors which must be considered by the PSC but are ultimately not dispositive. Each preemption case must be considered on the language of the particular statute at issue. We have previously noted that this Court has found preemption when state legislation is "extensive and embrace[s] *virtually* the entire area involved." *Nat'l Asphalt v. Prince George's Cty.*, 292 Md. 75, 78 (1981) (emphasis added).

Here, the General Assembly has expressly limited the role of local government to an advisory role in the CPCN approval process. In *Howard County*, we recognized that while the Legislature delegated approving authority over transmission lines to "a state agency with statewide powers, perspective and expertise", the Legislature "did not intend that local interests be ignored by the PSC, as evidenced by the right of counties to actively participate in the certification proceedings." 319 Md. at 528. Although we found that the statute preempted local zoning authority to approve transmission lines, we noted that under the statute, the counties may present recommendations during the PSC public hearings, "thus eliminating the potential for dual application procedures which may result in irreconcilably conflicting results. . . ." *Id.*

Consistent with our statutory interpretation in *Howard County*, under the plain language of PU § 7-207, the PSC is the ultimate decision-maker and approving authority of generating stations. Local government is a participant in the process and has an advisory role. The 2017 Amendment clarifies the role of local government as a significant

36

stakeholder in the process, whose recommendations, and local planning and zoning regulations must be duly considered[22] but leaves the PSC responsible for reaching the final balance that includes local planning and zoning as one of several factors.

### *Application of COMAR Regulations*

Finally, the County argues that the regulations promulgated by the PSC as set forth in COMAR 20.79.01.04 clearly identify the local Board of Zoning Appeals as a local agency with authority to approve or disapprove the construction of SEGS under the Zoning Ordinance. COMAR 20.79.01.04(e) requires that a CPCN application for the construction of a generating station include: "[a] list of each local, state or federal government agency having authority to approve or disapprove the construction or operation of the project." Although the regulation acknowledges that there may be other agencies which might have approving authority, the language is silent on which agencies might have authority, and/or what that authority might mean. We do not read the regulation to suggest that the Board of Zoning Appeals has authority to issue a separate approval of SEGS, particularly where the Board's approval or disapproval could be inconsistent with the PSC's final determination.

---

[22] To be clear, although we have found that PU § 7-207 impliedly preempts a local government or its zoning authority from having the final word on whether and where a generating station can be located, this holding should not be read to suggest that local governments do not have the authority to address solar projects in their comprehensive plans and zoning regulations. Through the 2017 Amendment, the General Assembly has expressly determined that local comprehensive plans and zoning regulations require due consideration by the PSC in its final approval of generating stations.

# V. CONCLUSION

PU § 7-207 preempts by implication local zoning authority approval for the siting and location of generating stations which require a CPCN. The statute is comprehensive and grants the PSC broad authority to determine whether and where SEGS may be constructed. Local land use interests are specifically designated by statute as requiring "due consideration" by the PSC. This includes the recommendation of the governing body of each county or municipal corporation in which any portion of the construction of the generating station is proposed to be located, as well as due consideration by the PSC of the consistency of the application with the comprehensive plan and zoning for the respective local jurisdiction.

Under the plain language of the statute, local government is a significant participant in the process, and local planning and zoning concerns are important in the PSC approval process. However, the ultimate decision-maker is the PSC, not the local government or local zoning board. Although local zoning laws are preempted and therefore not directly enforceable by the local governments as applied to generating stations such as SEGS, they are nevertheless a statutory factor requiring due consideration by the PSC in rendering its ultimate decision.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**