**PUBLIC SAFETY**

**POLICE OFFICERS – POLICE ACCOUNTABILITY AND DISCIPLINE – PREEMPTION – WHAT PROCEDURES APPLY TO A COMPLAINT OF DISCRIMINATION AGAINST A COUNTY POLICE OFFICER NOT INVOLVING A MEMBER OF THE PUBLIC**

February 13, 2025

*The Honorable Steuart L. Pittman, Jr.*
*County Executive, Anne Arundel County*

The Maryland Police Accountability Act of 2021 (the "Police Accountability Act" or the "Act") created a new framework for handling complaints of police misconduct.  *See* 2021 Md. Laws, ch. 59 (codified as amended at Md. Code Ann., Pub. Safety ("PS") §§ 3-101 to 3-114).  The Act establishes detailed procedures for misconduct complaints involving a member of the public.  But some complaints originate within the law enforcement agency and allege police misconduct that does not involve any member of the public.  Anne Arundel County requested an official opinion of the Attorney General to clarify what procedures govern these "fully internal" complaints.

The County's opinion request specifically concerns one category of fully internal complaints:  complaints of discrimination involving a police officer but not involving a member of the public. The County has a general policy governing discrimination complaint against County employees, but the County Police Department has its own procedures for fully internal misconduct complaints against officers.  The County asked which policy would govern a fully internal discrimination complaint against a County police officer.  As a general rule, we will issue official opinions of the Attorney General only on substantial questions of State law with ramifications beyond the specific local facts giving rise to the request. Here, although the County's question on its face addresses local law, it requires us to consider legal questions of statewide importance: the Act's procedural requirements for fully internal complaints and its relationship with local laws generally.

The County Attorney's view is that, as a matter of County law, the general County policy would govern, except where State law or regulations require otherwise.  The relationship between two county policies adopted by different agencies of county government is normally a question of local law, on which we would defer to a local jurisdiction's attorney.  We thus accept the County

3

Attorney's conclusion for purposes of our analysis. Unless State law requires otherwise, the County's antidiscrimination policy controls over the Police Department disciplinary policy to the extent of a conflict.

Our opinion concerns that caveat: "unless State law requires otherwise." Under the doctrine of preemption, State law can occupy a field of regulation to the exclusion of local law or override local law in case of a conflict. The County's question thus does raise a substantial issue of State law: whether the Act or its implementing regulations preempt all or part of the County antidiscrimination policy (as it applies to police officers) or give the Police Department policy priority over the general County policy.

We first conclude that the Act and its regulations do not occupy the field of police discipline. That is, local law can set procedures for fully internal police discipline matters if that local law does not conflict with State law. Nor does State law require that a county police department's disciplinary policy must always supersede a countywide personnel law or policy. Although the head of a law enforcement agency has power to promulgate disciplinary procedures, those procedures remain subject to otherwise applicable law, including local law. When a county police department policy conflicts with a county government personnel policy, and State law does not address the issue, county attorneys will need to decide which policy controls as a matter of local law.

The Act and regulations do, however, impose certain requirements on the handling of fully internal complaints. These requirements override the County's antidiscrimination policy to the extent of a conflict. We identify two areas where State law overrides the County policy. First, the imposition of discipline on an officer, even on a fully internal complaint, must follow the uniform State disciplinary matrix promulgated by the Maryland Police Training and Standards Commission (the "Commission"). Second, an officer who disputes the proposed imposition of discipline has a right to a hearing before a trial board under the provisions of the Act. These two requirements must be observed even when a County policy does not provide for them. Other than these two items, however, we see no conflict between the County policy and State law.

# I
# Background

## A.  *The Police Accountability Act*

The Act deals with "police misconduct," defined as:

> [A] pattern, practice, or conduct by a police officer or law enforcement agency that includes:
>
> > (1) depriving persons of rights protected by the constitution or laws of the State or the United States;
> >
> > (2) a violation of a criminal statute; and
> >
> > (3) a violation of law enforcement agency standards and policies.

PS § 3-101(g).  Conduct falling into any one of these three categories qualifies as "police misconduct."  *See* Letter from Sandra Benson Brantley, Counsel to the General Assembly, to Sen. Michael A. Jackson (Apr. 18, 2023).

The General Assembly passed the Act in 2021, effective July 1, 2022.  2021 Md. Laws, ch. 59.  The Act repealed the Law Enforcement Officers' Bill of Rights ("LEOBR"), which had governed police discipline in Maryland since 1974.  *Id.* § 2; *see also* 1974 Md. Laws, ch. 722.  LEOBR specified the steps a law enforcement agency had to take before it could impose punitive disciplinary measures on a police officer.  86 *Opinions of the Attorney General* 94, 98-99 (2001).  It not only preempted local law but also controlled over any conflicting State statute.  Md. Code Ann., Pub. Safety § 3-102(a)-(b) (2018 Repl. Vol.).

The Act replaced LEOBR's disciplinary system with a new one incorporating more civilian oversight.  *See, e.g.*, House Floor Proceedings No. 21A, 2021 Leg., Reg. Sess., at 1:09:21-1:09:40 (Mar. 10, 2021) (statement of Del. Atterbeary).  Complaints of police misconduct under the Act fall into one of three categories: first, complaints filed by a member of the public; second, complaints that originate within the law enforcement agency but still involve a member of the public (for example, an officer or supervisor might file a complaint alleging that another officer used

excessive force during an arrest); and third, complaints that do not involve a member of the public at all.

We will call complaints in this third category "fully internal" complaints. Again, a complaint counts as "fully internal" if it does not "involv[e] a member of the public." *See* PS § 3-104(d). A fully internal complaint might originate within an officer's chain of command, resembling employee discipline in the traditional sense. For example, a supervisor might allege that an officer has been insubordinate or absent without leave. Alternatively, one officer could file a fully internal complaint against another, as in the case of workplace discrimination.

Whether a complaint of misconduct involves a member of the public might sometimes present a close question. But because the County limited its question to misconduct not involving a member of the public and did not ask us to draw that line, we will focus our analysis on misconduct that clearly does not involve a member of the public, such as where one officer makes an allegation of discrimination or harassment against another officer or a supervisor. There is no question that such discrimination by an Anne Arundel County police officer is "police misconduct" under the Act's definition, because it violates department policy and, depending on the facts, possibly State law as well. PS § 3-101(g)(1), (3) (defining "police misconduct" to include "a violation of law enforcement agency standards and policies" and a violation of State law); Anne Arundel County Police Dep't, Index Code 302, Rule 25 (2023) (prohibiting discrimination and harassment); *id.* Rule 1 (prohibiting violations of County law, including County personnel regulations, by officers); *see also* Md. Code Ann., State Gov't § 20-901 (prohibiting discrimination by county employees).

We summarized the Act's procedures for complaints involving a member of the public in a recent opinion. 109 *Opinions of the Attorney General* 61, 62-63 (2024). Such a complaint may be filed either with the county's police accountability board (by a member of the public) or with the law enforcement agency itself (by any individual). PS §§ 3-102(a)(3), 3-103(a). When a law enforcement agency finishes its investigation of a complaint of misconduct involving a member of the public, it forwards its findings to an all-civilian administrative charging committee. PS § 3-104(d). The committee decides whether to bring administrative charges and, if it does, recommends discipline consistent with the uniform State disciplinary matrix. *See* PS § 3-104(e)(2), (3); COMAR 12.04.10.05. The head of the law

enforcement agency then makes an "offer of discipline" to the officer that equals or exceeds the committee's recommendation. PS § 3-105(c). If the officer refuses the agency head's offer, the case proceeds to a three-member trial board. PS §§ 3-105(c)(4), 3-106. Collective bargaining may not vary these procedures. PS § 3-111.

Two aspects of this process, the disciplinary matrix and the trial board, are especially relevant here. The disciplinary matrix is a tool for determining the appropriate penalty for an instance of misconduct: a table of disciplinary penalties ranging from formal written counseling to termination. COMAR 12.04.10.04D. The recommended penalty depends on the nature of the violation, the officer's history of similar violations, and any aggravating or mitigating factors. *See id.*; *see also* COMAR 12.04.10.03B(2), (9) (defining aggravating and mitigating factors). For complaints involving a member of the public, when an administrative charging committee administratively charges an officer with misconduct, the committee chooses an appropriate penalty from the matrix. *See* COMAR 12.04.10.05. The head of the agency then may offer the same penalty or a more severe penalty, but not a lesser penalty, to the officer. PS § 3-105(c)(2).

The second important component of the process for our purposes is the trial board. If the officer refuses the offer of discipline, they are entitled to a trial board hearing. PS § 3-105(c)(4). Although the agency has some flexibility to develop its own "trial board process," *see* PS § 3-106(a)(1), the process must comply with the Act, which addresses important details of the composition, powers, and hearing procedures of the board, *see id.* (b)-(j). For local law enforcement agencies, a trial board must consist of: "an actively serving or retired administrative law judge or a retired judge of the District Court or a circuit court," appointed by the county's chief executive; a civilian who is not a member of an administrative charging committee, appointed by the county's police accountability board; and a police officer of equal rank to the charged officer, appointed by the head of the law enforcement agency. PS § 3-106(b)(1). The law enforcement agency has the burden of proof, and the officer may be disciplined only for cause. PS § 3-106(h), (*i*). The officer may appeal an adverse decision to the circuit court. PS § 3-106(k), (*l*).

As these examples demonstrate, the Act specifies detailed procedures for some aspects of the disciplinary process. However, there are other important aspects of the police discipline process that the Act does not directly address. For example, the Act offers

few guidelines for how complaints should be investigated or officers interrogated. *See* 109 *Opinions of the Attorney General* at 66. Most importantly, because the Act's primary focus is the administrative charging committee process, which is limited to complaints involving members of the public, the Act says relatively little, at least explicitly, about the handling of fully internal complaints.

The Act authorizes the Commission to adopt implementing regulations. PS § 3-114. The Commission's regulations clarify some aspects of disciplinary procedure that the Act leaves unaddressed. For instance, the regulations clarify that the law enforcement agency must generally investigate all complaints of misconduct involving members of the public. COMAR 12.04.09.06B; *see* 109 *Opinions of the Attorney General* at 66, 71-72.

Unlike LEOBR, the Act contains no provision expressly preempting local law. In fact, the Commission's implementing regulations provide for local policy to govern fully internal complaints: "The agency head of each law enforcement agency shall develop the agency's own procedures to process complaints of misconduct that do not involve a member of the public." COMAR 12.04.09.01B. But, of course, local law and policy can come from many sources, including the head of the local law enforcement agency, the local County Council or Commissioners, and other local executive branch agencies outside the police department. What happens when more than one of these policies appears to apply to a category of police misconduct cases? That problem gave rise to Anne Arundel County's question.

## B.    *The Anne Arundel County Policies*

Two potentially conflicting local policies might govern a fully internal complaint of discrimination against an officer of the Anne Arundel County Police Department. The first is the general Anne Arundel County antidiscrimination policy that governs all county employees (the "County policy"). Because county police officers are employees of the county, this policy appears to apply to them. The second policy is the disciplinary policy specific to the Police Department, as promulgated by the County's Chief of Police (the "Police Department policy").

### 1. The County Policy

County Policy K-01 sets forth the process for handling discrimination and harassment complaints in Anne Arundel County government. It applies to "all classified, exempt, temporary, seasonal and contractual employees" of the County. Anne Arundel County, Employee Relations Manual No. K-01, at 1 (2019) ("County Policy K-01"). Under the policy, "[a]n employee who believes that he or she has been subject to harassment or discrimination should immediately bring the behavior to the attention of a supervisor, the Office of Personnel and/or the [Equal Employment Opportunity ("EEO")] Director." *Id.* at 3. Employees are encouraged to file a complaint with the Office of Personnel and/or the EEO Director if they are uncomfortable filing with their employing agency directly. *Id.* All complaints "will be investigated" upon filing. *Id.* "The County will make a decision as to who will investigate the alleged incident," which may be the Office of Personnel and/or the EEO Director rather than the employing department. *Id.* at 3-4.[1]

Once the investigation is complete, "[t]he County will make a determination and issue a report as to whether the allegations of harassment or discrimination were substantiated." *Id.* at 5. "If the allegations are proved, the County will issue remedial action and disciplinary action as appropriate, up to and including termination of employment." *Id.* The County does not have a precise disciplinary matrix but instead follows a policy of "progressive discipline" under which discipline generally begins with less severe penalties and progresses to greater penalties only if the violation is serious in nature or reflects a repeated pattern of misconduct. *See* Anne Arundel County, Employee Relations Manual No. F-01, at 1 (2024) ("County Policy F-01").

If the County proposes to terminate an employee for misconduct, including discrimination, the employee has a right to a hearing before the appointing authority or their designee. *Id.* at 4. Suspension, demotion, or termination of classified employees may be appealed to the County's Personnel Officer, then the County Personnel Board, and then the circuit court. Anne Arundel County Charter § 521(a)(2), (b); Anne Arundel County, Employee Relations Manual No. F-02 (2024) ("County Policy F-02").

---

[1] When the policy speaks of "the County" making certain decisions, we understand this normally means the County's Chief Administrative Officer, although the County Executive can also exercise this authority. *See* Memorandum from Gregory J. Swain, County Attorney, to Amal Awad, Police Chief 1, 3 (July 22, 2024).

Alternatively, the employee may request binding arbitration. *See* Anne Arundel County Code § 6-4-113. An applicable collective bargaining agreement might provide for different procedures. *See* Anne Arundel County Code § 6-4-104(a).

### 2. The Police Department Policy

The Anne Arundel County Police Department's policies, promulgated by the Chief, cover all types of misconduct complaints and generally track the Police Accountability Act. A fully internal complaint may be submitted to a supervisor, to the Internal Affairs Section, or through the Department's public complaints portal. Anne Arundel County Police Dep't, Index Code 303.2, § III.A.2 (2023) ("Index Code 303.2"). The Department's Office of Professional Standards (which includes Internal Affairs) oversees the investigation of complaints and may conduct the investigation itself or delegate it to the officer's supervisor. Anne Arundel County Police Dep't, Index Code 303.1, §§ II.A, II.C, III.A (2023) ("Index Code 303.1"); Anne Arundel County Police Dep't, Index Code 303, § VI.B.3 (2023) ("Index Code 303").

The investigating officer will make a recommendation on whether the complaint should be sustained. Index Code 303.2, § VIII.B. If the complaint is sustained, either the Chief of Police or the Commander of the Office of Professional Standards may offer discipline to the officer in accordance with the disciplinary matrix. *Id.*; *see also* Index Code 303.1, §§ III.B, IV.B. The officer may accept the offered discipline, in which case the discipline is imposed and the process ends, or instead may refuse the offered discipline and request a trial board hearing. Index Code 303.2, § VIII.B, VIII.C.

## II
## Analysis

Anne Arundel County has asked which of two policies—the County policy or the Police Department policy—would govern a fully internal discrimination complaint against a County police officer. The relationship between two local regulations or policies, and more specifically the question of which one controls in the event of a conflict, would ordinarily be a question of local law. We do not usually opine on questions of local law, instead deferring to the attorney for the local jurisdiction. *See, e.g.*, 89 *Opinions of the Attorney General* 76, 79 n.4 (2004). But we can and will consider

what requirements, if any, State law imposes on the resolution of fully internal complaints of police misconduct.

The doctrine of preemption determines when State law supersedes local law. There are three forms of preemption. First, express preemption "occurs when a State statute explicitly precludes local governments from making law in a certain area." 108 *Opinions of the Attorney General* 81, 92 (2023). Second, implied preemption precludes local governments from making law when "the General Assembly has acted with such force that an intent to occupy the entire field must be implied." *Id.* (quoting *Board of County Comm'rs v. Perennial Solar, LLC*, 464 Md. 610, 619 (2019)). Third, conflict preemption "occurs when a local law directly conflicts with State law." *Id.* Because the Act lacks an express preemption provision, we will consider only implied and conflict preemption.

The County Attorney concluded that, except as required by State law, the County policy rather than the Police Department policy governs fully internal discrimination complaints against County police officers. Memorandum from Gregory J. Swain, County Attorney, to Amal Awad, Police Chief 1, 5 (July 22, 2024) ("Swain Memorandum"). The County Attorney relied on a recent County Council enactment, Council Bill 21-24. *Id.* at 2-5. That legislation requires "a claim of discrimination arising out of county employment" to be "initiated, investigated, and resolved pursuant to" the general County personnel law and the County employee relations manual. Anne Arundel County Council Bill No. 21-24 (Apr. 24, 2024) (enacting County Code § 1-9-401(b)).[2] We therefore start from the baseline that the County policy rather than the Police Department policy governs fully internal complaints of discrimination against Anne Arundel County police officers.

---

[2] To be clear, although we accept the County Attorney's conclusion of Anne Arundel County law for purposes of answering the County's question, we are not concluding that a policy adopted by the county government necessarily always controls over a policy adopted by the head of the law enforcement agency on matters of police discipline. The relationship among local policies is a question for each jurisdiction's attorney to resolve by interpreting the local government's charter (if any), the local laws and ordinances that grant rulemaking authority, and the relevant policies themselves. It is possible that in some jurisdictions, the specific authority of a police chief to make rules for their department may override the general authority of a county personnel agency to make personnel regulations. But, according to the County Attorney, that is not the case in Anne Arundel County. The analysis may also be different for law enforcement agencies that are not county police departments. *Infra* note 6.

The question thus becomes:  when, if ever, does State law require a different result?  We will consider three possible scenarios.  First, under the doctrine of implied preemption, State law could occupy the field of police discipline to the exclusion of any local law or policy.  Second, State law could provide that a police department's disciplinary policy controls over a county's general personnel policy to the extent of a conflict.  In that second scenario, a local law requiring a different order of priority, like Anne Arundel County's Council Bill 21-24, would be preempted by conflict.  Third, even if application of the County policy is not preempted across the board, particular features of that policy could conflict with the Act or its regulations.

We examine each possibility in turn.  We first conclude that State law and regulations do not demonstrate an intent to occupy the field of police discipline because they leave significant aspects of the process unaddressed.  *Infra* Part II.A.  Second, we conclude that the Act and regulations do not categorically elevate an internal police department disciplinary policy above a County personnel policy on the same topic.  *Infra* Part II.B.1.  Finally, we examine the areas of potential conflict between the requirements of State law and the County policy.  We explain that the imposition of discipline on a County police officer must follow the State disciplinary matrix and afford the officer the right to a trial board under the Act.  But we otherwise identify no conflict between the County policy and State law.  *Infra* Part II.B.2.

### A.   *Implied Preemption*

Implied preemption, also known as field preemption, occurs when the General Assembly intends to reserve an entire field of law for itself.  *See, e.g.*, *Perennial Solar*, 464 Md. at 619.  Because the Police Accountability Act does not comprehensively cover the entire field of police disciplinary procedures but instead leaves significant areas unaddressed, our view is that the General Assembly did not intend to preempt that entire field.  This lack of field preemption leaves local governments free to make law in the area, assuming that the law neither exceeds the powers of the local government nor conflicts with State law.  We will discuss the possibility of conflict with State law further below.  *Infra* Part II.B.

"There is no particular formula for determining whether the General Assembly intended to preempt an entire area."  *Perennial Solar*, 464 Md. at 620.  But "[t]he primary indicia of legislative purpose to preempt an entire field of law is the comprehensiveness with which the General Assembly has legislated in the field."  *Id.*

(alteration in original) (quoting *Board of Child Care of Baltimore Annual Conf. of the Methodist Church, Inc. v. Harker*, 316 Md. 683, 696-97 (1989)).

Aside from the primary question of comprehensiveness, the implied preemption analysis also considers certain "secondary factors":

> 1) whether local laws existed prior to the enactment of state laws governing the same subject matter, 2) whether the state laws provide for pervasive administrative regulation, 3) whether the local ordinance regulates an area in which some local control has traditionally been allowed, 4) whether the state law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances, 5) whether a state agency responsible for administering and enforcing the state law has recognized local authority to act in the field, 6) whether the particular aspect of the field sought to be regulated by local government has been addressed by state legislation, and 7) whether a two-tiered regulatory process existing if local laws were not preempted would engender chaos and confusion.

*Id.* at 620-21 (quoting *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 299-300 (1993)). Maryland courts do not mechanically apply all seven of these factors in every case but will instead weigh them as appropriate in relation to the primary question of comprehensiveness. *See, e.g.*, *Montgomery County v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 693 (2019); *see also Perennial Solar*, 464 Md. at 633-35; 98 *Opinions of the Attorney General* 60, 93-94 (2013).

In our view, the Police Accountability Act does not occupy its field so comprehensively as to preclude all local lawmaking. The Act specifies detailed rules on some subjects, like the administrative charging process for public complaints of misconduct, PS § 3-104; the composition of trial boards, PS § 3-106(b); and the rules for suspending officers accused of misconduct, PS § 3-107. But the statute also "leave[s] gaps." 98 *Opinions of the Attorney General* at 94. For example, it addresses the investigation of complaints and interrogation of officers only

briefly and indirectly, *see* 109 *Opinions of the Attorney General* at 66, in contrast to LEOBR, which had covered these subjects in great detail, *see, e.g.*, 72 *Opinions of the Attorney General* 246, 254-55 (1987). Most importantly for our purposes, the Act is silent on most (but not all) questions regarding how fully internal complaints should be handled. *But see infra* Part II.B.2.i (explaining that the Act requires the use of the disciplinary matrix and trial board process for fully internal complaints).

Far from evincing an intent to occupy the field, the Act delegated important decisions about the discipline process to local governments and/or local law enforcement agencies. For example, it tasked localities to determine the membership of the county police accountability boards and the details of each agency's trial board process. PS §§ 3-102(b)(1)(i)(1), 3-106(a)(1). It is true that the General Assembly can carve out specified areas for a local government to regulate while still preempting the field. *See, e.g.*, *Altadis U.S.A., Inc. v. Prince George's County*, 431 Md. 307, 317 (2013). But here we think these express delegations, viewed alongside the gaps in the statutory scheme more generally, are evidence of a broader intent not to preempt. The express delegations are in areas where the General Assembly had otherwise made specific rules, such as the function of the police accountability boards and the composition and procedures of the trial boards. Those delegations thus may have been intended to provide some local authority even on these topics that the Act does expressly address. Therefore, we cannot conclude that the absence of an express delegation on other matters signifies an intent to reserve them.

The Act's omission of any express preemption language is especially significant because LEOBR did have such language. The older law had provided that "[a]ny local law is preempted by the subject and material of this [statute]." Md. Code Ann., Pub. Safety § 3-102(b) (2018 Repl. Vol.). The General Assembly knew that the purpose of the Act was to replace LEOBR. *See, e.g.*, H.B. 670, 2021 Leg., Reg. Sess. (Third Reader) (purpose paragraph); Revised Fiscal & Policy Note, H.B. 670, 2021 Leg., Reg. Sess. at 1. We also assume the Legislature was aware of LEOBR's major provisions, because we presume it to be familiar with existing law when it legislates. *See, e.g.*, *Criminal Injuries Compensation Bd. v. Gould*, 273 Md. 486, 498 (1975). Preemption of local law had been a significant feature of LEOBR. *See, e.g.*, *Moats v. City of Hagerstown*, 324 Md. 519, 526-27 (1991). We also note that the General Assembly in 2021 adopted the House's police discipline bill in preference to the Senate's, which did include preemption

language.  S.B. 627, 2021 Leg., Reg. Sess. (Senate Third Reader) (proposed PS § 3-102).  We infer that the General Assembly deliberately chose not to include a preemption provision analogous to LEOBR's in the Police Accountability Act.

This omission in turn implies a legislative intent not to preempt the field of police disciplinary procedures.  The General Assembly's affirmative refusal to add an express preemption provision to a legislative scheme is evidence that the scheme does not impliedly preempt local law.  For example, the General Assembly's rejection of an amendment that would have added express preemption to a law can be evidence against implied preemption, depending on the circumstances.  *See Complete Lawn Care*, 240 Md. App. at 698-99.  More generally, our opinions have noted that comparison of old and new regulations' provisions on local involvement is relevant to preemption analysis.  85 *Opinions of the Attorney General* 271, 280 (2000).  Thus, although the General Assembly did not reject preemption on repeated up-or-down votes as in *Complete Lawn Care*, there is still significant evidence that the General Assembly affirmatively rejected express preemption, which is important to the implied preemption analysis.

The legislative history of the Act further demonstrates an intent to balance statewide uniformity with local control.  Delegate Atterbeary, the lead House sponsor, explained that the purpose of the bill was to create one uniform disciplinary process for the entire State.  House Floor Proceedings No. 21A, 2021 Leg., Reg. Sess., at 1:32:00-1:32:45 (Mar. 10, 2021) (statement of Del. Atterbeary); *see also* Letter from Sandra Benson Brantley, Counsel to the General Assembly, to Del. Julian Ivey 3 (Apr. 21, 2023) ("Ivey Letter").

But, at the same time, legislators recognized that local governments would determine certain important details like the composition of the police accountability boards and the contours of the trial board process.  *See, e.g.*, Senate Floor Proceedings No. 42, 2021 Leg., Reg. Sess., at 5:56:18-5:56:33, 6:21:00-6:22:00 (Apr. 7, 2021) (statements of Sens. Smith, Cassilly, and Eckardt); *Voting Session on H.B. 670 Before the Senate Judicial Proceedings Comm.*, Part 3, at 11:09-11:20 (Mar. 30, 2021) (statement of Sen. Smith) (suggesting a general understanding that issues not addressed in the legislation would be left to localities to determine); *see also* Letter from Sandra Benson Brantley, Counsel to the General Assembly, to Del. Elizabeth Embry (May 23, 2024) (recognizing that, "due to the silence of State law on the manner of filling vacancies for" Baltimore City's Police Accountability Board

and Civilian Review Board, "the City Charter and Code would apply"). In other words, it appears that the General Assembly pursued uniformity by defining many aspects of the process in State law, but did not pursue it to the extent of precluding all local law on the same subject.

The "secondary factors" are also either inconclusive or weigh against preemption:

*1. Whether local laws previously existed on the subject.* It is true that local law generally did not exist in this area prior to the Police Accountability Act, which would normally weigh in favor of preemption. But because this absence of local law was the result of LEOBR's preemption provision, which the General Assembly chose not to import into the Act, this factor holds little weight.

*2. Whether the State laws provide for "pervasive administrative regulation."* The Act does provide for administrative regulation but without the level of detail held to support preemption in earlier cases. *Compare* PS § 3-114, *with*, *e.g.*, *Talbot County v. Skipper*, 329 Md. 481, 489 (1993), *and* 85 *Opinions of the Attorney General* at 279.

*3. Whether the local law regulates an area of traditional local control.* The local policy addresses an area where local control has *not* traditionally been allowed—discipline of police officers—but again, this was because of LEOBR, which has now been repealed. And more broadly, the terms and conditions of local government employment are a longstanding area of local control. *See, e.g.*, Md. Code Ann., Local Gov't § 10-303.

*4. Whether the State law provides for concurrent local legislative authority.* As discussed, the Act does expressly provide concurrent legislative authority to local jurisdictions on some subjects, although the express delegations are relatively few.

*5. Whether the responsible State agency has recognized local authority to act.* The Commission's regulations do respect the ability of local governments to flesh out various aspects of the police discipline process, subject to State law. *See, e.g.*, COMAR 12.04.09.01B.

*6. Whether the State law addresses the specific subject where the locality has acted.* The particular subject addressed here—the process for handling fully internal complaints—is mostly left

unaddressed by the Act, with certain exceptions. *See infra* Part II.B.2.i.

*7. Whether local action in the area would create "chaos and confusion" by establishing a two-tiered regulatory process.* Because the Act and regulations generally leave the development of the fully internal complaint process to local governments, recognizing local authority in this area would not lead to a "two-tiered regulatory process" engendering "chaos and confusion." *Allied Vending*, 332 Md. at 300.

For all these reasons, we do not think that the Police Accountability Act impliedly preempts the field of police disciplinary procedures generally, or procedures for handling fully internal complaints of police misconduct specifically.

The Commission's implementing regulations also do not occupy the field. In fact, we have expressed doubts that an agency's regulations can establish field preemption when the governing statute does not. *See* 69 *Opinions of the Attorney General* 183, 193 n.7 (1984). But even assuming field preemption by regulation were possible, we do not think the Commission has attempted to preempt the field here.

The Commission's regulations on the police discipline process, like the statute, are not comprehensive. They focus on certain specific aspects of the process—the establishment of Police Accountability Boards, COMAR 12.04.09.03, the establishment and procedures of administrative charging committees for complaints involving the public, COMAR 12.04.09.04-.07, and the uniform disciplinary matrix, COMAR 12.04.10.01-.05. They also incidentally and briefly address certain other topics, such as the requirement to investigate complaints, though even then the focus remains on complaints within an administrative charging committee's jurisdiction. *See* COMAR 12.04.09.06B. Finally, the Commission's regulations explicitly leave open the development of procedures for fully internal complaints. COMAR 12.04.09.01B, .04B. We thus conclude that there is no field preemption in this area either by statute or by regulation.

## B. Conflict Preemption

Because State law does not occupy the field of police discipline, local governments have some ability to make law or policy in the area. This is not the end of the preemption analysis, however.

We still must consider conflict preemption: local law yields when it conflicts with State law. Conflict preemption can take the form of "verbal conflict," when "local law would authorize something State law prohibits or would prohibit something State law expressly authorizes." 108 *Opinions of the Attorney General* at 92 (citing 98 *Opinions of the Attorney General* at 91). It alternatively can take the form of "functional conflict" which arises when there is "some element of irreconcilability or legal inconsistency . . . such that both the State and local laws cannot be applied together." *Id.* Both State statutes and State regulations may preempt local law by conflict. *See, e.g.*, 68 *Opinions of the Attorney General* 242, 246-47 & n.5 (1983); 89 *Opinions of the Attorney General* 195, 203 (2004); *see also* 69 *Opinions of the Attorney General* 183, 200 (1984) (noting that local law may not conflict with State permit conditions).

To identify potential conflicts, we must first determine what the State statute and regulations require or prohibit. The "cardinal rule of statutory interpretation" is to "ascertain and effectuate the General Assembly's purpose and intent when it enacted the statute." *E.g.*, *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021). This analysis begins with the "normal, plain meaning" of the language the General Assembly used, interpreted in the context of the statutory scheme and the legislative purpose. *E.g.*, *id.* at 376-77. We may also consult other indicia of legislative intent, such as legislative history, to confirm our reading of the text or to resolve ambiguities. *E.g.*, *Blackstone v. Sharma*, 461 Md. 87, 113-14 (2018). And we must give the statute "a reasonable interpretation" that aligns "with common sense." *Wheeling*, 473 Md. at 377 (quoting *Lockshin v. Semsker*, 412 Md. 257, 276 (2010)). The same principles govern interpretation of regulations, *see, e.g.*, *Thanner Enters., LLC v. Baltimore County*, 414 Md. 265, 277 (2010), though we must examine the intent of the promulgating agency rather than the General Assembly, *see, e.g.*, *Kor-Ko Ltd. v. Maryland Dep't of Env't*, 451 Md. 401, 417-18 (2017) (quoting *Lockshin*, 412 Md. at 275-76).

Before finding a conflict, however, we will attempt to harmonize State and local enactments—to find a reading under which they do not conflict, so that both can be given effect—as far as we reasonably can. *See, e.g.*, 88 *Opinions of the Attorney General* 76, 85 (2003); *see also Mayor & Council of Forest Heights v. Frank*, 291 Md. 331, 337 (1981) (applying the same principle to the relationship between county and municipal enactments).

As we will explain, the application of a County personnel policy to police disciplinary matters does not categorically conflict with State law. But certain specific aspects of Anne Arundel County's antidiscrimination policy do conflict with the Act and its regulations: State law requires the use of the uniform disciplinary matrix and the Act's trial board process for all police discipline matters. This means, in practice, that in those areas, police discipline will follow the Police Department policy, which incorporates those aspects of the Act, rather than the County policy.

1. *Whether State Law Exempts the Police Discipline Process from General County Personnel Rules*

Under local law, the County's antidiscrimination policy supersedes the police department policy to the extent of a conflict. But we must consider whether that order of priority conflicts with State law. In particular, the Commission's regulations provide that "[t]he agency head of each law enforcement agency shall develop the agency's own procedures to process complaints of misconduct that do not involve a member of the public." COMAR 12.04.09.01B; *see also* COMAR 12.04.09.04B ("A law enforcement agency shall establish written procedures for handling complaints of police officer misconduct that do not involve members of the public.").

One might argue that, under these regulations, the procedures developed by the Chief of Police control to the exclusion of any other County law, because COMAR 12.04.09.01B expressly provides that *the agency head* shall develop the law enforcement agency's "own procedures." On this view, the State regulation would preclude the application of any procedures to a fully internal complaint of police misconduct other than the law enforcement agency head's in-house procedures.

But we do not read the Commission's regulations that way. It would be very unusual for a State regulation to grant a subordinate officer of a county's or municipality's executive branch, whose position is created by local law, the power to make rules independent of the local legislative body or the head of the executive branch. It would be equally unusual for a State regulation to exempt a core department of County government, like the police department, from otherwise applicable County law.

Such a regulation would clash with the common-sense understanding of how an executive branch typically functions. Normally, the chief executive can control the policies of executive departments. *Cf.* 81 *Opinions of the Attorney General* 58, 60

(1996) (observing that generally, the Governor can control the exercise of the powers vested in the core departments of the State's executive branch). Of course, there are many exceptions to that general rule; an agency can be made independent by law. *Cf., e.g.*, Letter from Adam D. Snyder, Chief Counsel, Opinions & Advice, to Sen. Paul G. Pinsky & Del. Anne R. Kaiser 18 (Sept. 16, 2016). But we are not aware of any examples of a local police department, that is, the primary general law enforcement agency established by a local government, having that status, let alone a State law conferring that status on a local law enforcement agency.[3]

Reading the Commission's regulation to mean that the Chief of Police's policy always controls over local law would produce incongruous results. Anne Arundel County itself illustrates those incongruities. The Chief of Police is a subordinate officer in the executive branch of the Anne Arundel County government. The County Executive appoints the Chief, and both the County Executive and the Chief Administrative Officer have supervisory and management authority over her. *See* Anne Arundel County Charter §§ 401, 405, 543.[4] The County Executive, in turn, must take care that the County Council's enactments are faithfully executed. *See id.* § 405(g). It would upend that structure to give the Chief independent policymaking authority outside the County Executive's control or to make the Police Department exempt from otherwise applicable County law.

At the very least, if the Commission intended to give police chiefs the power to develop disciplinary procedures exclusive of

---

[3] The Baltimore Police Department is a special case because until recently it was considered a State agency for most if not all purposes. *See, e.g.*, *Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 303-04 (2001); *see also* 2021 Md. Laws, ch. 133 (converting the department into a City agency contingent on the enactment of a City Charter amendment). Our analysis here focuses on police departments, like the Anne Arundel County Police Department, that are agencies of the local government only.

[4] The Charter does not explicitly state that the Chief serves at the pleasure of the County Executive. But the Chief lacks a defined term of office. *See* Anne Arundel County Charter § 543; *see also* 68 *Opinions of the Attorney General* 315, 315-16 (1983) (noting that officers without defined terms are presumed to serve at the appointing authority's pleasure). She also is not covered by the County's merit system. *See* Anne Arundel County Charter § 802(a)(3). Whether the Chief serves at the County Executive's pleasure is a question of local law, but assuming she does, that would make it even more unusual for her to have policymaking authority independent of the County Executive.

any other local law, we would have expected the Commission to say so clearly. But the regulations do not clearly compel that reading. They could also be read—and were more likely intended—as merely clarifying that neither the Act nor the Commission dictates the content of the procedures for fully internal complaints and that each law enforcement agency can have its own procedures. So understood, the regulation imposes a duty and authority on the chief in each jurisdiction to develop those procedures in the first instance but subject to otherwise applicable law. That understanding aligns with how rulemaking at administrative agencies normally works. The agency has power to promulgate rules, but the rules must comply with other governing law. *See, e.g.*, *Board of Liquor License Comm'rs v. Hollywood Prods., Inc.*, 344 Md. 2, 11 (1996).

Some statements during the Commission's drafting process supported the idea that the agency head should be the one to actually promulgate the governing procedures, with local government superiors having only a consultative role. *See, e.g.*, Maryland Police Training & Standards Comm'n, Mar. 2, 2022 Meeting, at 37:20-38:02 (statement of Joseph J. Gamble, Talbot County Sheriff). One speaker even went further, suggesting that chiefs and sheriffs alike should have independent policymaking authority. *See id.* at 49:18-49:50 (statement of David Morris, Maryland Chiefs of Police Ass'n).

But because of the variety of views expressed at the Commission meeting on this issue, it is difficult to identify any consensus. Other speakers indicated that the Commission would not, or should not, disrupt the normal allocation of legislative authority in local governments. For example, the chair of the commission said that "[t]he autonomy" to develop procedures is "still going to fall [on] the . . . local law enforcement agencies, whether it's the sheriffs themselves that come up with the process or it's the chief *through his Council or Mayor* [who] comes up with the process." *Id.* at 57:20-57:40 (statement of Troy Berry, Charles County Sheriff and Commission Chair) (emphasis added). As another speaker put it: "I don't think there's any reason or any interest that the Commission would have to step on a locality's legislative authority." *Id.* at 13:29-13:38 (statement of John Fitzgerald, Chief of Police, Chevy Chase Village).[5] We thus do not

---

[5] The draft regulation originally contained an express reference to disciplinary policy being made by or through a "local governing authority," and this reference was removed in the drafting process. But it appears the main objection to the language was from sheriffs' office

see clear evidence of intent on the part of the Commission to exempt local police chiefs' procedures from otherwise applicable local law.

What is more, there is no doubt that the agency's process for fully internal complaints must be consistent with all requirements of the Act itself. For example, the internal process must use the State disciplinary matrix. *See infra* Part II.B.2.i. Thus, the law enforcement agency's internal policy cannot possibly control over all "higher law"—it must adhere to State law—and there is no way to read the regulation's text that would distinguish some categories of "higher law" (State statutes) from others (County Council enactments) and exempt the Police Department from the latter only.

To the extent any doubt remains, we have an obligation to reconcile State and local law to the extent there is a "reasonable construction" that allows both to operate harmoniously. 88 *Opinions of the Attorney General* at 85-86 (quoting 1A Singer, *Statutes and Statutory Construction* §30:5 (6th ed., 2002 rev.)). Such a harmonizing construction exists here. Under COMAR 12.04.09.01B and .04B, each law enforcement agency must develop procedures for handling fully internal complaints. But these procedures must also comply with otherwise applicable local law, just as the law enforcement agency must follow the directives of the local legislature and chief executive in other cases. If, under local law, a general law or policy of the local government would apply to some category of fully internal complaints (or all of them), and if the head of the law enforcement agency would not normally have authority to deviate from that local law, the State regulations do not confer that authority.[6] This interpretation gives effect to

---

representatives who thought it would create confusion about whether sheriffs would be subject to county law. *See* Maryland Police Training & Standards Comm'n, Mar. 2, 2022 Meeting, at 33:00-40:11, 41:30-46:30 (statements of various speakers); *see also infra* note 6. We do not think the removal of this language signifies an intent to deprive county legislatures or chief executives of authority over county police department disciplinary matters.

[6] We conclude only that the Commission's regulations do not grant law enforcement agency heads authority that they would otherwise lack to develop disciplinary procedures independent of otherwise applicable law. For some agencies, other law might grant the necessary rulemaking authority or exempt the agency from local law. Sheriffs in particular are independent State officers with common-law authority to make rules for their personnel. *See* 84 *Opinions of the Attorney General* 158, 159

both the Commission's regulations and an applicable local law's (here, the Anne Arundel County Charter's) allocation of authority in local government.

> 2.   *Whether Any Particular Procedures in the County Policy Conflict with State Law*

We have concluded that the Act and the Commission's regulations allow local law, promulgated by County authorities other than the police chief, a place in the discipline process for fully internal complaints. We have also accepted, for purposes of our analysis, the County Attorney's conclusion that the County policy generally governs fully internal complaints of discrimination against County police officers. We must now consider whether any specific feature of the County policy conflicts with the Act or the Commission's regulations. Again, where possible, we will attempt to harmonize the applicable enactments.

An opinion of our Office offers some guidance on harmonizing laws that govern police misconduct. In 72 *Opinions of the Attorney General* 246 (1987), we considered how to apply the State Ethics Law's investigatory and enforcement procedures to officers of State law enforcement agencies consistent with LEOBR. Although the opinion involved two State statutes, LEOBR and the Ethics Law, it applied a conflict-preemption-like analysis because LEOBR expressly provided that the statute controlled over any conflicting State law. Md. Code Ann., Pub. Safety § 3-102(a) (2018 Repl. Vol.). So even though LEOBR has been repealed, the opinion's analysis is still useful in evaluating conflict preemption questions in the context of police discipline.

The 1987 opinion concluded that LEOBR did not divest the Ethics Commission of its statutory authority to investigate ethics complaints against police officers because there was no "irreconcilable conflict" between the two statutes' investigation provisions. 72 *Opinions of the Attorney General* at 252-53. We also concluded, however, that any Ethics Commission investigation would need to comply with LEOBR's restrictions. *Id.* at 253. For example, Ethics Commission staff would need to initiate an interrogation of an officer through the officer's employing agency, and Ethics Commission investigators could not directly interrogate the officer. *Id.* at 255-56. The Ethics

---

(1999). Only "clear and unambiguous" legislation may abrogate that authority. *Id*. at 162. As such, our opinion should not be construed as addressing the extent to which deputy sheriffs are subject to county personnel laws and policies.

Commission also could not take enforcement action against the officer itself but could forward its findings to the chief and recommend that the chief do so, whereupon the chief had the option to initiate LEOBR's trial board process. *Id.* at 259-60. "This construction allow[ed] effect to be given to the legislative purpose of both statutes, avoid[ed] illogical and absurd results, and at the same time preserve[d] the procedural safeguards granted to officers by LEOBR." *Id.* at 260. We will take a similar approach to harmonizing the Police Accountability Act with the County's antidiscrimination policy.

We will first address those areas where State law requires a different procedure than the County policy. We will then explain why the County policy otherwise does not conflict with State law and may be given effect.

> i. *Areas Where State Law Supersedes the County Policy*

*1. The Disciplinary Matrix.* The first area in which the Act supersedes the County antidiscrimination policy is the use of the disciplinary matrix. The County antidiscrimination policy does not specify a particular penalty for discrimination. *See* County Policy K-01 at 7. Under the general County employee discipline policy, what disciplinary penalty to impose for misconduct is left to the discretion of the appointing authority, subject to certain broad guidelines like the notion of progressive discipline. *Supra* Part I.B.1. In contrast, the Act requires the use of the Commission's disciplinary matrix to determine penalties for police misconduct. *Supra* Part I.A. The Police Department policy requires use of the disciplinary matrix in all cases. *Supra* Part I.B.2.

In considering whether the Act requires the use of the disciplinary matrix for fully internal complaints, we read the relevant provisions in the context of the statute as a whole. *See, e.g.*, *Berry v. Queen*, 469 Md. 674, 687 (2020) (quoting *Brown v. State*, 454 Md. 546, 550-51 (2017)). The Act as a whole is concerned predominantly with misconduct involving members of the public. Section 3-102 of the Act requires each county to have a police accountability board whose purpose is to provide public oversight of law enforcement in the county, including appointing the civilian members of charging committees and trial boards, receiving misconduct complaints from the public, and reviewing disciplinary matters considered by the administrative charging committees, which have jurisdiction over misconduct involving the public. Section 3-103 empowers an "individual" to file a complaint

of misconduct with a law enforcement agency, though as we will discuss below, *see infra* Part II.B.2.ii.1, this provision may also be concerned with allegations of misconduct involving the public. Section 3-104 governs the administrative charging committee process, which applies only to allegations of misconduct involving the public. Section 3-105's provision for the offer of discipline by the chief assumes that the chief is acting on administrative charges initiated by the administrative charging committee. *See* PS § 3-105(c). Section 3-107's provision on temporary suspension of officers applies "[p]ending an investigatory, administrative charging committee, and trial board process" and allows an officer suspended without pay to receive back pay if the *administrative charging committee* decides not to issue charges. *See* PS § 3-107(a). Section 3-108 requires law enforcement agencies to have a victims' rights advocate and a case tracking database so that members of the public can be informed about the progress of disciplinary cases in which they may be interested. And § 3-113, which governs the timing of review of complaints, deals only with the review of complaints from members of the public that are under consideration by an administrative charging committee. The Act, then, is mostly focused on the administrative charging committee process, which is in turn limited to complaints of misconduct involving the public.

The legislative history of the Act also demonstrates this focus on police misconduct involving the public. The original impetus behind the General Assembly's 2021 police reform efforts was the murder of George Floyd and similar incidents where members of the public were injured or killed by police officers. *See* 107 *Opinions of the Attorney General* 33, 41 (2022). The Act, in particular, was motivated by the desire to reform police discipline in order to prevent further such incidents in Maryland,[7] to restore trust between the public and law enforcement,[8] and to provide greater public oversight of law enforcement.[9] That is to say, the

---

[7] *See, e.g.*, Senate Floor Proceedings No. 38A, 2021 Leg., Reg. Sess., at 2:34:30-2:39:55 (Apr. 1, 2021) (statement of Sen. Carter); Senate Floor Proceedings No. 45, 2021 Leg., Reg. Sess., at 2:10:00-2:10:45 (Apr. 10, 2021) (statement of Sen. Ellis).

[8] *See, e.g.*, Senate Floor Proceedings No. 38A, 2021 Leg., Reg. Sess., at 2:07:33-2:12:40 (Apr. 1, 2021) (statement of Sen. Augustine); Senate Floor Proceedings No. 45, 2021 Leg., Reg. Sess., at 2:24:39-2:25:02 (Apr. 10, 2021) (statement of Sen. Smith).

[9] *See, e.g.*, House Floor Proceedings No. 21A, 2021 Leg., Reg. Sess., at 1:09:21-1:09:35 (Mar. 10, 2021) (statement of Del. Atterbeary).

relationship between law enforcement agencies and the public was the Legislature's main focus.

Statements by sponsors and others with knowledge of the bill further support the idea that, with certain exceptions, the Act's procedures were expected to govern complaints of misconduct involving the public. For example, the chair of the Senate Judicial Proceedings Committee explained on the Senate floor that "this process that we've set up is generally . . . from the PAB to the charging committee, that's for public [complaints]." Senate Floor Proceedings No. 42, 2021 Leg., Reg. Sess., at 6:03:30-6:03:38 (Apr. 7, 2021) (statement of Sen. Smith). The counsel to the Speaker, asked by a legislator whether the bill's process was "just for public complaints," told a House subcommittee that it was, and that "the internal stuff to the police department, insubordination, showing up late, all of that stuff will still be handled internally." *Work Session on H.B. 670 Before the House Judiciary Comm., Pub. Safety Subcomm.*, 2021 Leg., Reg. Sess., at 1:21:16-1:21:46 (Feb. 26, 2021) (statement of Matthew Jackson, counsel to the Speaker). And the chair of the House Judiciary Committee asked the House to reject a floor amendment that would have applied the bill's procedures to internal complaints, without questioning the amendment sponsor's suggestion that, absent the amendment, the bill would not cover such complaints. *See* House Floor Proceedings No. 21A, 2021 Leg., Reg. Sess., at 4:08:22-4:11:24 (Mar. 10, 2021) (statements of Dels. Kipke and Clippinger). The House followed the Chair's recommendation and rejected the floor amendment. *Id.* at 4:11:28-4:11:58.

It thus appears that the Legislature understood that, for the most part, the Act as enacted in 2021 did not address the process for handling fully internal misconduct complaints. As a result, given our mandate to construe statutory provisions in light of the broader statutory scheme, we will look for relatively clear evidence of legislative intent before we conclude that a particular provision of the Act was intended to have broader application.

On the specific question of applicability of the disciplinary matrix, however, we do see the necessary evidence of intent to require application of the matrix to fully internal complaints as well as complaints involving the public. In 2022, the year after enacting the Act, the General Assembly enacted further legislation to clarify the applicability of certain provisions. 2022 Md. Laws, ch. 141. The amendment provided that the administrative charging committee's jurisdiction would cover complaints "involving a member of the public and a police officer, regardless of whether

the complaint originated from within the law enforcement agency or from an external source." *Id.* (amending PS § 3-104(d)). The new legislation then added still broader language to govern the coverage of the disciplinary matrix: each agency would be required to adopt the matrix "for all matters that may result in discipline of a police officer." *Id.* (amending PS § 3-105(b)).

The language of this latter amendment is clear. The disciplinary matrix applies to "all matters that may result in discipline," regardless of whether a member of the public is involved. The contrast between the amendment to § 3-104(d), which limited the charging committee's jurisdiction to complaints "involving a member of the public," and the amendment to § 3-105(b), which included no such limiting language, is also significant. "[W]hen a legislature uses different words . . . it usually intends different things." *E.g.*, *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223 (2003).

The 2022 legislation's purpose paragraph aligns with this understanding as well. Among the 2022 bill's stated purposes was "specifying that [the uniform] disciplinary matrix applies to all complaints of police misconduct." 2022 Md. Laws, ch. 141 (purpose paragraph). The Commission seems to share this understanding that the disciplinary matrix covers fully internal complaints, and the matrix itself reflects that understanding. It covers (for instance) minor damage to a police vehicle, attire and grooming violations, and tardiness, all of which would most likely only be the subject of a fully internal complaint. COMAR 12.04.10.04D(8)(c); Commission, *Statewide Police Disciplinary Matrix Resource Guide* 6 (2022). For all these reasons, we agree with the County Attorney's conclusion that the Act, as amended, requires that the disciplinary matrix apply to fully internal complaints of discrimination against police officers. Swain Memorandum at 5.

*2. The Trial Board.* The Act and the County policy also provide for different processes in the case where the employee challenges the proposed discipline. Under the County policy, more severe sanctions like demotion, suspension, and termination may be appealed by a multi-step process through the County personnel office and then to circuit court. *Supra* Part I.B.1. There is, by default, no appeal process for lesser sanctions, although a collective bargaining agreement may provide a different grievance process for a particular group of employees. *See* County Policy F-02, at 1. The Act gives an officer who refuses the agency head's proposed discipline (of whatever severity) the right to a hearing before a

three-member trial board, composed as the Act directs, and from there to circuit court. PS §§ 3-105(c)(4), 3-106. The Police Department policy provides for a trial board in all disciplinary matters. *Supra* Part I.B.2.

We again agree with the County Attorney that the trial board process applies to fully internal complaints of misconduct against police officers. Swain Memorandum at 5. At least one circuit court has reached the same conclusion. Opinion and Order, *Handler v. City of Brunswick*, No. C-10-CV-24-000331 (Frederick County Cir. Ct. Aug. 30, 2024). Under the Act as originally enacted in 2021, the applicability of the trial board process to fully internal complaints was less clear. As we have explained, the Legislature's main focus in 2021 was on complaints involving the public.

Again, however, the 2022 amendment clarified matters. In particular, the Legislature specifically inserted the word "all" into PS § 3-106(a)(1), such that the provision now says that "each law enforcement agency shall establish a trial board process . . . to adjudicate *all* matters for which a police officer is subject to discipline." 2022 Md. Laws, ch. 141 (emphasis added). According to the bill title, the purpose of this change was to "specif[y] that the purpose of [the] trial board process is to adjudicate all internal and external matters for which a police officer is subject to discipline." 2022 Md. Laws, ch. 141 (purpose paragraph). As mentioned above, the same legislation applied the administrative charging committee process to "complaint[s] of police misconduct involving a member of the public and a police officer." 2022 Md. Laws, ch. 141 (amending PS § 3-104(d)). Thus, if the General Assembly had wanted to establish a narrower scope for the trial board process— narrower than the broad language, "all matters," would otherwise indicate—it knew how to do so.

The legislative history of the 2022 amendment confirms our conclusion. A representative of the Maryland Sheriffs' Association told the House Judiciary Committee that the bill would apply the trial board process to internal complaints, including complaints by one officer against another. *Hearing on S.B. 389 Before the House Judiciary Comm.*, 2022 Leg., Reg. Sess., at 14:00-16:30 (Apr. 8, 2022) (statements of Darren Popkin, Montgomery County Sheriff); *see also* Senate Floor Proceedings No. 56, 2022 Leg., Reg. Sess., at 1:19:52-1:22:23 (Mar. 29, 2022) (statements of Sens. Kramer and Smith) (committee chair assuming that the trial board process would apply to all misconduct allegations, including minor uniform

violations).[10] The legislative history is thus consistent with the text. The General Assembly meant the trial board process to govern all disciplinary matters involving police officers. The Act preempts the County policy to the extent that it mandates a different process.

### ii.    *Areas Where the County Policy Is Not Preempted*

Apart from the requirement to use the disciplinary matrix to determine disciplinary penalties, and the right of an officer who refuses discipline to request a trial board under PS § 3-106, there are several other areas where the Police Department policy differs from the County policy. First, the County policy allows complaints of discrimination or harassment to be filed with the County's personnel office or equal employment opportunity office, County Policy K-01 at 3, whereas the Police Department policy requires fully internal complaints of police misconduct to be filed with the Department, *supra* Part I.B.2. Second, the County policy allows the County personnel office or equal employment opportunity office to investigate complaints, including complaints originally filed with the Police Department, County Policy K-01 at 3-4, while the Department policy provides that the Department will investigate all internal allegations of police misconduct, *supra* Part I.B.2. Finally, the County policy allows County officials outside the Department to decide that there is sufficient evidence of misconduct to initiate formal charges, and to determine the initial offer of discipline, County Policy K-01 at 7, whereas the Department policy vests this authority solely in the Chief or her designee, *supra* Part I.B.2. The question is whether any of these aspects of the County policy conflict with the Act or its implementing regulations.

We conclude that none of these aspects of the County policy conflict with State law because both the Act and the implementing regulations are silent on all three of these questions: where fully internal complaints may be filed; who may, or must, investigate

---

[10] The 2022 clarifying amendments to the Act originally passed the Senate as part of S.B. 389 and were heard by the House Judiciary Committee under that bill number. S.B. 389, 2022 Leg., Reg. Sess. (Senate Third Reader). The House committee took no action on S.B. 389 but instead amended the relevant provisions into S.B. 763, a previously unrelated bill that had already passed the Senate, in place of S.B. 763's original content. Amend. No. 843225/1, S.B. 763, 2022 Leg., Reg. Sess. (House Judiciary Comm.). After a conference committee restored some of the original S.B. 763, the amended bill passed both chambers. Conference Comm. Report 853327/1, S.B. 763, 2022 Leg., Reg. Sess.; 2022 Md. Laws, ch. 141.

fully internal complaints; and who may initiate disciplinary charges and make the initial offer of discipline when there is a fully internal complaint of misconduct. Although LEOBR addressed some of these issues, there is no question that the General Assembly in 2021 intended to repeal LEOBR in its entirety. And when the General Assembly chose not to import some aspect of LEOBR into the new Act, we presume, absent contrary evidence, that the omission was intentional. *See supra* Part II.A.

As we have explained, the predominant focus of the Act, as enacted in 2021, is on complaints of misconduct involving members of the public. And although the 2022 amendments clarified that certain provisions of the Act extend beyond public complaints, those amendments were limited in scope to particular aspects of the process, namely the trial board and disciplinary matrix. *See* 2022 Md. Laws, ch. 141; *supra* Part II.B.2.i. While the bill also made changes to the administrative charging committee process, it did not expand that process to cover fully internal complaints. 2022 Md. Laws, ch. 141 (amending PS § 3-104(d)). Because the General Assembly, in enacting the 2022 amendments, extended only certain limited provisions of the Act to apply to fully internal complaints, there is support for an inference that, in other areas not addressed by the 2022 amendments, the General Assembly understood that other aspects of the process would not govern fully internal complaints. That understanding also aligns with the legislative history of the original 2021 bill. *Supra* Part II.B.2.i.

This is not to say that explicit language is always required for us to conclude that some other aspect of the Act's process, aside from the disciplinary matrix and trial board provisions, governs fully internal complaints. But some relatively clear evidence of legislative intent, like the language in § 3-105(b) and § 3-106(a) discussed in the previous section, is necessary before we will conclude that the Legislature intended a particular provision of the Act to have broader application.

The Commission's regulations, when read as a whole, show a similar focus on misconduct involving the public. The Act's implementing regulations span two chapters. The first chapter covers the disciplinary process generally. Its purpose provision states that the chapter "establishes a civilian process to receive and process allegations of police officer misconduct involving a member of the public." COMAR 12.04.09.01A. This chapter, then, is focused on complaints involving the public. Its only reference to internal complaints is to require each agency to

develop its own procedures for them. *See supra* Part II.B.1. The other chapter, COMAR 12.04.10, establishes the disciplinary matrix along with procedures for applying the matrix in particular cases. Chapter 10 does not have limiting language akin to Chapter 09's purpose provision. But while the matrix itself applies to all misconduct complaints, *supra* Part II.B.2.i.1, at least some of the procedural provisions of Chapter 10 assume a complaint that is proceeding through the administrative charging committee process. *See, e.g.*, COMAR 12.04.10.05B-C.

During the regulatory drafting process, the Commission initially assumed that both the disciplinary procedures of the Act and the disciplinary matrix would apply only to misconduct involving the public. *See* Maryland Police Training & Standards Comm'n, Feb. 16, 2022 Meeting, at 3:05:03-3:05:20, 3:18:20-3:19:47 (adopting motion to construe the Act as governing only public complaints); *id.*, Mar. 2, 2022 Meeting, at 1:23:02-1:36:13 (same for disciplinary matrix). The 2022 amendments to the Act, which passed while the Commission was still working on its regulations, required that the matrix itself apply to all complaints. *Supra* Part II.B.2.i.1. But, as we have discussed, the legislative amendments did not extend to all aspects of the disciplinary process. And we see no indication in the Commission's deliberations that the Commission intended to expand the scope of its regulations on subjects other than the applicability of the matrix itself. Consistent with our treatment of the Act, then, we will look for evidence of regulatory intent to apply a particular provision of the Commission's regulations to fully internal complaints before we conclude that the provision so applies.

Thus, in areas where neither the Act nor the regulations establish a procedural rule applicable to fully internal complaints, we start with the presumption that the handling of such complaints is left to local law. The Anne Arundel County Police Department is a department of county government like any other, and police officers are county employees. Absent State law requiring different treatment, a charter county has authority over personnel matters for its own employees. *See* Md. Code Ann., Local Gov't § 10-303; *Anastasi v. Montgomery County*, 123 Md. App. 472, 490 (1998). In some jurisdictions, as a matter of local law, a police-department-specific policy may control over the personnel policies for local employees generally. *Supra* note 2. But that is not the case for Anne Arundel County, at least for claims of discrimination or harassment covered by the County policy. *See* Swain Memorandum at 1. And as we will explain, in the three areas discussed below, namely the filing of complaints, investigations,

and initiation of charges, we have identified nothing in State law that conflicts with the County policy. The County thus may apply the County policy to fully internal complaints of discrimination against its police officers.

*1. Where Complaints May Be Filed.* The Act has two provisions on filing complaints. First, the county's police accountability board shall "receive complaints of police misconduct filed by members of the public." PS § 3-102(a)(3). Second, "[a]n individual may file a complaint of police misconduct with the law enforcement agency that employs the police officer who is the subject of the complaint." PS § 3-103(a). The use of the different terms "member[] of the public" in § 3-102(a)(3), and "individual" in § 3-103(a), suggests that the General Assembly intended § 3-103(a) to have broader scope, potentially including "individuals" who are not "members of the public," such as other police officers. *See Toler*, 373 Md. at 223.

But recall that a police officer can file a complaint of misconduct involving a member of the public, such as a complaint that another officer used excessive force on an arrestee. Those complaints go through the administrative charging committee process. PS § 3-104(d). The use of "individual" in § 3-103(a) may have been intended simply to encompass that category of complaints: complaints by officers that *do* involve members of the public. Perhaps more tellingly, § 3-103(a) is framed in permissive rather than restrictive terms. *See* PS § 3-103(a) ("An individual *may* file a complaint . . . ." (emphasis added)). That phrasing suggests that the language was merely intended as an authorization for complaints to be filed with the law enforcement agency, not a requirement that they must be. Based on these considerations, together with the Act's overall focus on complaints of misconduct involving the public, we do not think that § 3-103(a) (or any other provision of the Act) reflects a legislative intent to restrict where fully internal complaints may be filed. Local law or policy could authorize a category of fully internal complaints to be filed with a different agency.

*2. Who May Investigate Complaints.* The second question is who may investigate fully internal complaints of misconduct against police officers. Does the Act require that such complaints be investigated only by the law enforcement agency? We do not think so. The Act addresses investigations only indirectly. 109 *Opinions of the Attorney General* at 66. Even then, it speaks only to complaints that are subject to review by an administrative charging committee, that is, complaints of misconduct involving a

member of the public. *See* PS §§ 3-104(d), (e)(1), (f)(1), 3-108, 3-113. The Commission's regulations impose an explicit duty to investigate on the law enforcement agency. COMAR 12.09.04.06B; 109 *Opinions of the Attorney General* at 65-66. But that regulation is part of a COMAR chapter that generally applies only to complaints of misconduct involving the public. *See* COMAR 12.09.04.01A. Nothing in the Act, then, provides that fully internal complaints of police misconduct must always and exclusively be investigated by the law enforcement agency. A County policy providing for outside investigations in some circumstances does not conflict with the Act.

The Act's history supports the conclusion that it does not forbid outside investigations. LEOBR allowed investigations of police misconduct by investigators outside the law enforcement agency. For example, the State Ethics Commission could investigate ethics violations by officers. 72 *Opinions of the Attorney General* at 252-56. We also opined that the City of Frederick could establish an independent review commission to investigate police misconduct provided that the commission could not impose discipline itself. 86 *Opinions of the Attorney General* 94, 102-03 (2001); *see also* Letter from Kathryn M. Rowe, Assistant Attorney General, to Del. Salima Siler Marriott (Apr. 1, 1999) (same for Baltimore City). We presume the General Assembly, in passing the Act, was aware of that background. *See, e.g.*, *Donlon v. Montgomery County Pub. Schs.*, 460 Md. 62, 95 (2018).

These earlier opinions did have one important limitation: an outside agency, like the Ethics Commission or a municipality's independent review board, could investigate police misconduct but could not interrogate an officer themselves, or compel an officer to participate in the investigation or answer questions. *See* 72 *Opinions of the Attorney General* at 256; 86 *Opinions of the Attorney General* at 102. But that was because a provision of LEOBR explicitly restricted who could interrogate an officer in a disciplinary investigation. Md. Code Ann., Pub. Safety § 3-104(b) (2018 Repl. Vol.). That provision has, of course, been repealed along with the rest of LEOBR. Although the Senate-proposed bill to replace LEOBR would have retained a similar requirement, *see* S.B. 627, 2021 Leg., Reg. Sess. (Third Reader) (proposed PS § 3-105(a)(3)), that bill did not pass. The House's bill passed instead and became the Act. H.B. 670, 2021 Leg., Reg. Sess.

By repealing this aspect of LEOBR without replacing it, the General Assembly in effect restored the default rule that a public

employer may order an employee to answer job-related questions and impose disciplinary action if the employee refuses. *See Department of Pub. Safety & Corr. Servs. v. Shockley*, 142 Md. App. 312, 323-24 (2002); Letter from Robert N. McDonald, Chief Counsel, Opinions & Advice, to Del. Shane Pendergrass at 2 (May 23, 2003).[11] A county police officer is an employee of the county. *See Hines v. French*, 157 Md. App. 536, 573 (2004) (recognizing that county police departments do not have legal existence independent of the county). So in the absence of any law to the contrary, this principle would apply to police officers.

Indeed, one provision of the Act could be read as affirmatively authorizing such interrogations. Section 3-107(d) provides that "[i]n connection with a disciplinary matter under [the Act], a police officer may be required to submit to . . . interrogations that specifically relate to the subject matter of the investigation." Notably, in using the passive voice, the statute does not limit who may conduct such an "interrogation." In fact, this provision appears to be derived from an earlier provision of LEOBR, but with one key difference: the LEOBR provision stated that "[t]he *law enforcement agency may order* the law enforcement officer under investigation to submit to . . . interrogations that specifically relate to the subject matter of the investigation." Md. Code Ann., Pub. Safety § 3-104(*l*)(1) (2018 Repl. Vol.). The change in language from "the law enforcement agency may order" to "a police officer may be required to submit" suggests that the General Assembly did not intend, in the Act, to limit compulsory interrogation authority to the law enforcement agency alone.

One paragraph within this provision does create uncertainty. Section 3-107(d)(2) states that if a police officer refuses to be interrogated, "the law enforcement agency may commence an action that may lead to a punitive measure as a result of the refusal." Perhaps this could imply that *only* the law enforcement agency may conduct compulsory interrogations or impose discipline for refusal. But this provision may simply reflect that the General Assembly was primarily focused on complaints of misconduct involving the public, where generally the law enforcement agency will be responsible for the investigation. *See* 109 *Opinions of the Attorney General* at 72.

Given the overall context of the changes from LEOBR to the Act, § 3-107(d)(2) taken in isolation is a weak reed on which to rest

---

[11] However, the constitutional privilege against self-incrimination limits the use, in a later criminal proceeding, of any statements compelled under threat of discipline. *Shockley*, 142 Md. App. at 323-24.

a total prohibition on non-law-enforcement-agency interrogations of officers.[12]  This is especially true given that the primary purpose of § 3-107(d) was apparently just to codify the constitutional rule on how compelled statements by officers may be used, *see supra* note 11, rather than to limit who may compel such statements, *see Voting Session on H.B. 670 Before the House Judiciary Comm.*, 2021 Leg., Reg. Sess., at 30:00-32:15  (Mar. 5, 2021) (statements of Dels. Clippinger and Atterbeary).

As noted, the Commission's regulations provide that "[a] law enforcement agency shall complete a thorough investigation upon receipt of a complaint of alleged police officer misconduct." COMAR 12.04.09.06B.  But, again, this regulation is part of a chapter governing the administrative charging committee process for misconduct involving the public.  *See* COMAR 12.04.09.01A. The specific regulatory subsection establishing the duty to investigate is flanked on both sides by provisions that explicitly deal with complaints from the public and/or involving the public. *See* COMAR 12.04.09.06A, C.  Thus, the regulation does not appear to govern who may investigate complaints that are *not* subject to the administrative charging committee process.

In our view, then, there is no State-law barrier to a local law authorizing an agency of county government outside the police department to investigate fully internal allegations of police misconduct and to require the officer to participate in the investigation.

*3. Who May Initiate Discipline.*  We turn now to the third and final point of possible conflict:  who may initiate formal charges and make the original offer of discipline.  Again, the Act is silent on this question in the context of fully internal complaints. Although the disciplinary matrix must be used for any matter that

---

[12] Our Office has also previously advised that a local government may not empower its police accountability boards to conduct independent investigations of misconduct or grant them subpoena power.  Ivey Letter at 2-3.  But that advice was in the context of complaints of misconduct involving the public (the only type of complaint the police accountability boards receive), where the Act and regulations are much more prescriptive.  Additionally, the Counsel to the General Assembly noted in that advice that the General Assembly had specified the functions and powers of the police accountability boards, thus implying that they did not intend local governments to grant them additional powers.  *See id.* However, she was not asked and so did not consider whether other agencies of local government, especially in a charter county, might be able to investigate fully internal misconduct complaints.

may result in discipline, *see* PS § 3-105(b), there are no provisions specifying who may initiate discipline based on a complaint that did not pass through an administrative charging committee. The provision requiring the chief to offer discipline assumes that the chief is acting upon an administrative charging committee's charge. *See* PS § 3-105(c). Because the statutory scheme as a whole is concerned primarily with misconduct involving the public, we conclude that the Act leaves open the question of who may offer discipline for fully internal complaints.

Some aspects of the Commission's regulations do assume that only the administrative charging committee, law enforcement agency head, or trial board will be in the position of applying the disciplinary matrix. For example, the regulations provide that when multiple sustained violations arise from the same incident, "as applicable, an agency head or Administrative Charging Committee" may consolidate multiple violations into a single penalty. COMAR 12.04.10.02B(2). This assumes that there are only two "applicable" authorities who could be making a disciplinary determination: the administrative charging committee or the agency head. Other provisions use similar language, though some also include the trial board. *See, e.g.*, COMAR 12.04.10.04C(1),(2), .04D(9)(b), .05D, .05G(1).

But if the Commission only intended those procedural provisions to govern the public complaints process in the first place, this limitation makes sense. After all, in the disciplinary process for misconduct involving the public specified by the Act, only the administrative charging committee, head of the law enforcement agency, and trial board will be in the position of applying the matrix or offering discipline. These provisions thus equally support the conclusion that the Commission did not intend for them to govern fully internal complaints at all.

One might also argue that because the General Assembly required administrative charging committee and trial board members to be trained in police procedures, the Legislature must have intended that only individuals with such training may take part in the police discipline process. *See* PS §§ 3-104(c), 3-106(d). But just because the General Assembly thought that training was necessary for part-time members of charging committees and trial boards does not necessarily mean that they thought the same would be necessary for local government personnel professionals who regularly handle disciplinary matters in the course of their work. Thus, these training requirements still make logical sense if the

statute as a whole is read as governing only the public complaints process (except where specified).

Local personnel discipline is ordinarily a matter for local governments. A local government may establish procedures for discipline of local employees, including specifying who may formally prefer charges or initiate discipline, unless State law preempts those local procedures. Police departments are no exception. *See Fraternal Order of Police, Montgomery County Lodge No. 35 v. Mehrling*, 343 Md. 155, 183-84 (1996); *City of Hagerstown v. Blenard*, 268 Md. 382, 385-87 (1973). And as we have explained, the Act generally addresses only the handling of complaints of misconduct involving the public, except where there is clear evidence of legislative intent to apply a particular provision more broadly. *See supra* Part II.B.2.i.

We therefore conclude that the Act does not address the issue of who may initiate discipline. If authorized by local law, an official of county government may initiate disciplinary charges against a county police officer based on a fully internal complaint of misconduct and offer discipline based on the disciplinary matrix. As always, if the officer refuses that discipline, they are entitled to a trial board hearing under PS § 3-106.

*4. Application of Conflict Preemption Principles.* Having set forth our understanding of the Act and regulations, we apply the principles of conflict preemption to the County policy. As we have explained, there are two recognized forms of conflict preemption under Maryland law: verbal conflict and functional conflict. Verbal conflict exists when local law permits something State law prohibits, or prohibits something State law expressly permits. Because the Act does not prohibit the filing of fully internal complaints outside the law enforcement agency, the investigation of such complaints other than by the law enforcement agency, or the initiation of disciplinary charges outside the law enforcement agency, a local law establishing these possibilities would not create a verbal conflict. Although the closest question is perhaps whether the Act requires the original offer or imposition of discipline to be made only by the chief, nothing in the Act's or the regulations' text clearly establishes a rule governing who may initiate discipline based on a fully internal complaint, nor is there any other evidence of intent on the part of the General Assembly or the Commission to make a rule on that specific issue.

Nor does a local law or policy establishing these procedures create a functional conflict. Though courts have not been as clear

about what a functional conflict involves, "[i]n general, some element of irreconcilability or legal inconsistency is required, such that both the State and local laws cannot be applied together." 93 *Opinions of the Attorney General* 126, 135 (2008). But, if we conclude that the Act generally does not address the subject of fully internal complaints (except in certain specified respects), local laws on that subject would not functionally conflict with the Act. The scenarios where functional conflicts have been recognized include cases where it would have been impossible to comply with both State and local law; cases where a local government would have been prohibited from taking action mandated by the State; and other cases of conflicting State and local directives in the same subject area. 108 *Opinions of the Attorney General* at 105-06. But none of those circumstances exist here, where the State and local laws address two separate, albeit related, subjects. *See id.*

One might argue that our interpretation, allowing local law to govern aspects of the fully internal complaints process, conflicts with the General Assembly's purpose of establishing a uniform police discipline process for the whole State. *See* Ivey Letter at 3. But the Legislature did not pursue that purpose "at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). Rather, it provided for complaints of misconduct involving a member of the public and complaints of misconduct not involving a member of the public, to follow different tracks. *See* PS § 3-104(d). Only the former would fall within the administrative charging committee's jurisdiction and the related procedures. *See id.* The statute also allowed local variation in the trial board process. PS § 3-106(a)(1) (authorizing each law enforcement agency to establish its own trial board process). The General Assembly, then, apparently sought to accommodate two important values: uniformity and local control.

We therefore conclude that, except for the need to follow the disciplinary matrix and trial board process, we have identified nothing in the County policy that conflicts with any rule for fully internal complaints established by the Act or the Commission's regulations. And where no such conflict exists, the County policy may govern a fully internal complaint of discrimination against a County police officer.

### III
### Conclusion

Neither the Police Accountability Act nor its implementing regulations occupy the field of police disciplinary procedures. And

the Commission's regulations do not authorize a law enforcement agency to develop procedures for fully internal complaints that are independent of otherwise applicable local law. Thus, the County can apply the procedures in its general nondiscrimination policy to fully internal complaints against police officers, unless a particular procedure conflicts with the Act or its regulations. Under its policy, the County, including the County's personnel office and equal employment opportunity office, may receive complaints of discrimination filed by one police officer against another, investigate fully internal discrimination complaints, and initiate discipline against an officer based on a fully internal discrimination complaint. But the offer of discipline, if any, must follow the uniform State disciplinary matrix, and the officer may refuse that discipline and request a trial board hearing that follows the Act's procedures.

> Anthony G. Brown
> Attorney General of Maryland
>
> Thomas S. Chapman
> Deputy Chief, Opinions and
>   Advice

Patrick B. Hughes
Chief Counsel, Opinions and Advice